586 F.2d 79
 3 Fed. R. Evid. Serv. 1249
 UNITED STATES of America, Appellant,
v.
91.90 ACRES OF LAND, SITUATE IN MONROE COUNTY, MISSOURI, and
Walsh Refractories Corporation, C-E Refractories
and Combustion Engineering, Inc., Appellees.
 No. 77-1944.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 12, 1978.
Decided Nov. 6, 1978.
 
 Maryann Walsh, Atty., Dept. of Justice, Washington, D. C., for appellant; James W. Moorman, Asst. Atty. Gen., Carl Strass, Attys., Dept. of Justice, Washington, D. C., on brief.
 Jerome W. Seigfreid, Edwards, Seigfreid, Runge & Leonatti, Mexico, Mo., for appellees; Louis J. Leonatti, Mexico, Mo., on brief.
 Before ROSS, Circuit Judge, MARKEY, Chief Judge,* and HENLEY, Circuit Judge.
 HENLEY, Circuit Judge.
 
 
 1
 This is an appeal by the government in an eminent domain case from a judgment entered on a jury verdict returned in the United States District Court for the Eastern District of Missouri. The jury found that the owner of the property involved in the case was entitled to just compensation in the sum of $245,966.00. The government had contended that the amount of just compensation that should be paid ranged between $26,600.00 and $31,200.00. A post-trial motion of the government for a new trial, or, alternatively, for a large remittitur having been denied, this appeal was timely filed.
 
 
 2
 For reversal, the government contends that the former owner of the property, C-E Refractories, a division of Combustion Engineering, Inc., hereinafter called "CE" or the "landowner," was permitted by the district court to pursue an improper route in establishing the amount of compensation that it should receive for the taking, and that improper evidence of value was admitted. CE denies that the government's position has merit, and in addition it asserts that counsel for the government failed to make and preserve a proper record in the district court, and, further, that in any event the error or errors, if any, of the district court were harmless and do not call for reversal.
 
 
 3
 The land directly involved in the case consists of 91.90 acres of land in Monroe County in the northern part of the Eastern District of Missouri. It was originally part of a larger tract of 140 acres of land that CE acquired when it merged with Walsh Refractories Corporation, a manufacturer of firebrick and other refractory products.[1] Prior to CE's acquisition the land had been owned by Walsh Refractories which had acquired it from a Mr. Lemley.
 
 
 4
 Walsh Refractories operated and CE still operates a plant for the manufacture of firebrick and other refractory items at Vandalia, Missouri, which is about forty miles from the property with which we are concerned. The property is located between Hannibal and Paris, Missouri, and apparently fronts on a county road in Monroe County.
 
 
 5
 A portion of the property is underlaid with a deposit of soft plastic clay which CE uses in its manufacturing process to beneficiate other clays that it uses. The clay deposit is located under twenty acres of the property. It appears to be undisputed that there is no clay under the remaining portions of the land.
 
 
 6
 The exploiting of a clay deposit involves strip mining in the course of which overburden has to be removed so as to expose the deposit; the over-all operation apparently produces pollutants of one kind or another including pollutants that can cause undesirable or dangerous impurities in streams.
 
 
 7
 In recent years strip miners have been substantially affected in their operations by federal and state legislation designed to protect and improve the natural environment, and strip miners have had to deal with federal and state regulatory agencies, one of which is the federal Environmental Protection Agency (EPA) and another of which is the Missouri Clean Water Commission. Missouri strip miners are now required to avoid stream pollution and to replace overburden that has been removed from mined areas.
 
 
 8
 On December 16, 1976 the government filed a complaint in condemnation and a declaration of taking whereby the government condemned a portion of the original 140 acre tract for use in connection with the Clarence Cannon Dam & Reservoir Project on the Salt River. The government condemned a little more than 87 acres of the land in fee, and it also imposed permanent flowage easements with respect to two ravines; those easements affected 4.9 acres of land. At the same time the government deposited in the registry of the district court the sum of $22,750.00 as estimated just compensation for the over-all taking. On January 31, 1977 the district court signed an order authorizing the government, represented by the Army Corps of Engineers, to take possession of the property that had been condemned.
 
 
 9
 In February, 1977 the landowner filed an answer. In that pleading CE did not deny that the government had a right to take and condemn the lands and interests described in the complaint and declaration of taking, but it denied that the $22,750.00 deposited in the registry of the district court was just compensation for the taking. CE prayed that just compensation be determined by reference to the highest and best use of the property, and CE demanded trial by jury.
 
 
 10
 While the land condemned, including the easements, amounted to 91.90 acres of land which left CE the owner of 48.10 acres, we find it convenient to refer to the property actually taken by the government as the "90 acre" tract and to the portion remaining to CE as the "50 acre" tract.
 
 
 11
 While it is undisputed that the clay deposit involved in the case is located on the 50 acre tract and that none of it is located on the 90 acre tract, nevertheless the landowner took the position in the district court that it had used the entire 140 acre tract in connection with its extraction of the clay from the 50 acre tract.[2] And CE contended that its inability to make use of the 90 acre tract substantially diminished the value of the remaining 50 acres, and that for that reason CE was entitled to have "severance damage" included in its award of just compensation.
 
 
 12
 Although CE might have abandoned its clay mining operation following the taking and might have contended in the condemnation proceedings that the taking of the 90 acre tract rendered continued mining on the 50 acre tract unfeasible, CE determined to continue the operation, and a few weeks prior to the trial it formed a plan whereby the clay deposit could be mined without utilizing the 90 acre tract. The plan was an expensive one. It called for extensive and costly improvements on the 50 acre tract and it involved the loss of more than 44,000 tons of clay.
 
 
 13
 At the trial CE undertook to recover for the loss of the clay that its new plan entailed and also sought to recover the cost of the improvements that were called for by the plan.
 
 
 14
 The government contended that the taking of the 90 acres had not significantly damaged the remaining 50 acres, and that the plan developed by CE for continued mining of the clay was unnecessary and unreasonably expensive. The government also contended that the items in question should not be included in the jury's award of just compensation and that evidence as to them should not be admitted.
 
 
 15
 In October, 1977 the case was the subject of a four day jury trial. CE called as witnesses Stig E. Scharthi, its plant superintendent at Vandalia; L. Verle Porter, its mining superintendent; Dr. Walter D. Keller of Columbia, Missouri, an eminent retired professor of geology; and Mr. Robert Turner who prior to his retirement had been a mining superintendent for A. P. Green Refractories which, according to Mr. Turner, is the largest manufacturer of refractory products in the world. CE also called as expert "value witnesses" four men qualified in general as real estate appraisers, but none of whom was a geologist and none of whom had any experience in making estimates of the value of clay deposits.
 
 
 16
 Prior to putting its value witnesses on the stand, counsel for CE had its earlier witnesses describe the property and describe the clay, its special qualities and its alleged scarcity which, according to Mr. Scharthi, amounted to uniqueness.
 
 
 17
 Mr. Scharthi and Mr. Porter were also permitted to testify as to the quantities of clay involved and to its per ton value, to describe the plan of CE and the cost thereof, and to describe how the plan would affect the mining of the clay deposit. Those witnesses agreed that as of the date of taking there were approximately 327,000 tons of clay in the ground of which 44,000 tons would be lost as a result of the plan being put into operation.[3] Mr. Scharthi testified that the value of the clay in the ground was $1.95 per ton which included an extra ten cents for the alleged "uniqueness" of the material. Scharthi came up with a final figure of $540,097.21, including the value of the 90 acre tract which he considered to be about $1,000.00 per acre.
 
 
 18
 The testimony of Porter was essentially the same as that of Scharthi; however, his valuation of the clay in place was $1.85 per ton. But, his final figure was somewhat higher than Scharthi's figure.
 
 
 19
 Those figures were turned over to the appraiser witnesses and were accepted by them in forming and expressing their ultimate opinions as to the amount of compensation CE was entitled to receive on account of the partial taking.
 
 
 20
 The first value witness called by the landowner was Wayne C. Miller. We need to consider his method of valuation in some detail because it incorporated CE's theory of just compensation in the case and because the other value witnesses called by CE used essentially the same method. Mr. Miller first valued the surface of the entire 140 acres of land immediately before the taking without regard to the minerals, and he placed that value at $1,000.00 per acre or $140,000.00. That valuation was based on a number of sales that he considered to be "comparable sales." He next accepted the tonnage figures on the clay that had been given him by Scharthi and Porter, and he accepted Porter's value of $1.85 per ton; he also accepted the figures that had been given him with respect to the costs of CE's reconstruction of its operation. He added the sum of those figures to the $140,000.00 surface value figure and came out with a total "before taking" figure, including "severance damage," of $746,092.71. In coming to an "after taking" figure, Mr. Miller took no account of the surface value of the remaining 50 acres of land. He established the "after taking" value solely by reference to the alleged value of the clay in the ground, less the value of the 44,000 tons that would be lost as a result of CE's plan. His difference between the "before taking" and "after taking" values in question was $546,929.56.
 
 
 21
 There was very little difference between Miller's final figure, and the final figures reached by the three other value witnesses. Those figures were: Chester Young, $547,731.56; Murray Colbert, $547,731.56; and Darryl Ridgely, $540,097.21. (Mr. Ridgely had given the 140 acres a surface value of $925.00 per acre rather than $1,000.00 per acre.)
 
 
 22
 At the conclusion of the testimony of Mr. Miller, counsel for the government advised the district court and opposing counsel in chambers that he was going to move to strike the testimony of all of the value witnesses of the landowner on the ground that they were taking an improper valuation approach, and that their testimony was incompetent. However, counsel stated that he was uncertain as to whether to move to strike the testimony of the witnesses one by one or to withhold his motion until all of them had testified. The trial judge stated that he preferred that government counsel wait until all of the value witnesses of CE had testified and then make his motion, and that in the meantime the government's rights would be preserved.
 
 
 23
 After the completion of the testimony of Mr. Ridgely CE rested, and the government promptly moved or renewed its motion to strike applying it this time to all of the landowner's value witnesses. The trial court overruled the motion, and the government proceeded to put on its case.
 
 
 24
 Government first called Dr. William J. Lang, a distinguished expert in the field of geology, including clays in general and fire clays in particular. Dr. Lang testified that there is no shortage of fireclay in the United States or in North Missouri, that there is no real difference between the clay on the 50 acre tract and other clays in the area, and that qualities of given clays can be changed rather easily. He did not consider that the taking of the 90 acre tract affected the clay on the 50 acre tract, and he thought that the plan of operation on that tract devised by CE was unnecessary and unreasonably expensive.
 
 
 25
 Dr. Lang also testified that in valuing a clay deposit you do not take an estimated tonnage in the ground and multiply it by a unit price per ton. He stated that the proper approach was to multiply an estimated tonnage in the ground by a royalty that the owner of the clay might expect to receive over the life of the deposit, and then reduce the expectation to present value. He was of the view that a reasonable royalty on the clay involved in the case was from twenty to twenty-five cents per ton.
 
 
 26
 Proceeding, Dr. Lang expressed the opinion that if there were some 327,000 tons of clay in the ground as of the date of taking, the maximum amount of tonnage that could be profitably extracted per year was 12,000 tons, and that the extraction process would cover a little more than 27 years. He calculated that the annual royalty received would be $3,000.00, and that using a 10% Rate of interest the present value of the royalty would be $27,763.00. Asked to assume a royalty of seventy-five cents a ton, he expressed the opinion that the present value of the expectable royalty payments would be $83,289.00. Those figures, of course, are very much lower than the figures resulting from a multiplication of tons in place by a unit value of each ton.
 
 
 27
 Dr. Lang's views were communicated to the value witnesses that the government expected to call, and they accepted those views just as the value witnesses called by CE had accepted the opinions and figures of Mr. Scharthi and Mr. Porter.
 
 
 28
 The government called two value witnesses, Tom McReynolds and Murray Kniffen.
 
 
 29
 Mr. McReynolds expressed the opinion that the difference between the value of the 140 acre tract immediately before the taking and the value of the 50 acre tract immediately after the taking was $26,600.00. Mr. Kniffen was slightly more liberal and expressed an opinion that the difference between the before taking and after taking values was $31,200.00. McReynolds thought that the surface value of the land was $300.00 per acre; Kniffen thought that it was $350.00 per acre.
 
 
 30
 Neither of those two witnesses undertook to give the clay on the 50 acre tract any dollars and cents value. They did not do so because they had been advised directly or indirectly by Dr. Lang that the value of the clay had not been impaired by the taking of the 90 acre tract. What they did in this connection was to testify that the surface value of the original 140 acres was enhanced to the extent of "x" percent by the presence of the clay, and that the value of the remaining 50 acres was enhanced by the same "x" percent by the presence of the clay.
 
 
 31
 After the conclusion of the government's case the landowner put on some rebuttal testimony and then rested. At this stage counsel for the government moved for an instructed verdict within the range of the testimony of its witnesses. That motion was denied.
 
 
 32
 Both sides submitted requests for instructions which did not differ materially from the instructions that the trial judge actually gave, and there were no objections to the instructions that were given.
 
 
 33
 Having stated the case in some detail, it now becomes necessary to decide it.
 
 I.
 
 34
 Where the government in the exercise of its power of eminent domain condemns for public use the property of a person, including a corporation, the fifth amendment to the Constitution provides that the property owner is entitled to just compensation for the property or estate taken.
 
 
 35
 Just compensation is measured generally by the fair and reasonable market value of the property or interest taken, as of the date of taking, which in this instance is December 16, 1976.
 
 
 36
 Down through the years a number of principles to be applied in the determination of just compensation have become established; those principles have generally become pretty well understood by judges, lawyers and real estate appraisers. And ordinarily the application of those principles creates no problem in cases of taking of entire ownerships. However, more difficulty seems to be encountered in cases in which the government has taken only part of a single holding; while the solution to the problem is simple, it seems to be frequently missed. And, the difficulty seems to arise out of the concept of "severance damage."
 
 
 37
 Where the government condemns only part of a single holding, just compensation is to be measured by the difference between the fair and reasonable market value of the entire ownership immediately before the taking and the fair and reasonable market value of the portion not taken immediately after the taking. Where the partial taking not only deprives the owner of the property that is actually taken but also diminishes the value of the property remaining to the owner, this diminution is often and "somewhat loosely," United States v. Miller, 317 U.S. 369, 376, 63 S.Ct. 276, 87 L.Ed. 336 (1943), referred to as "severance damage."
 
 
 38
 Problems in connection with the determination of just compensation in cases of partial takings have been discussed by this court in quite a number of cases including United States v. 403.14 Acres of Land in St. Clair County, Mo., 553 F.2d 565 (8th Cir. 1977); United States v. 1162.65 Acres of Land in Henry and St. Clair Counties, Mo., 498 F.2d 1298 (8th Cir. 1974); United States v. 967,905 Acres of Land in Cook, et al. Counties, Minn., 447 F.2d 764 (8th Cir. 1971), Cert. denied, 405 U.S. 974, 92 S.Ct. 1193, 31 L.Ed.2d 248 (1972); United States v. Birnbach, 400 F.2d 378 (8th Cir. 1968).
 
 
 39
 It is incorrect to think of "severance damage" as a separate and distinct item of just compensation apart from the difference between the market value of the entire tract immediately before the taking and the market value of the remainder immediately after the taking. In the case of a partial taking, if the "before and after" measure of compensation is properly submitted to the jury, there is no occasion for the lawyers or the trial court to talk about "severance damage" as such, and indeed it may be confusing to do so. United States v. 403.14 Acres of Land in St. Clair County, Mo., supra, 553 F.2d at 567, n.2. The matter is taken care of automatically in the "before and after" submission.
 
 
 40
 It is thoroughly established by the cases heretofore cited, including United States v. Miller, supra, one of the leading cases, that a landowner whose property is condemned in whole or in part is entitled to the full and perfect equivalent in money of the property or estate taken, which equivalent is, as indicated, measured by the concept of "fair and reasonable market value."
 
 
 41
 The fair and reasonable market value of a tract of land is that price which a reasonable seller who desires to sell but is not required to sell would demand for the property and the price which a reasonable buyer who desired to buy but was not required to buy would pay for the same, assuming a reasonable time for negotiations and explorations of alternatives. That concept of market value was recognized by the trial court and by counsel on both sides in this case.
 
 
 42
 The landowner is entitled to have the market value of his property determined by reference to the highest and best use for which it is available and for which it is plainly adapted, and here the jury was justified in finding that the highest and best use of this property both before and after the taking was the mining of clay from the deposit underlying the 20 acres that have been mentioned.
 
 
 43
 The landowner is also entitled to have the fact finder take into consideration all factors of value that would affect the market value of the property. From the landowner's standpoint, a factor of value would be anything that would induce a reasonable seller to demand more for the property and would induce a reasonable buyer to pay more on account of the existence of the value factor.
 
 
 44
 It must be kept in mind, however, that the landowner is not entitled to have all factors affecting the value of his property added together and to have the total of the additions taken as the reasonable market value of his land. For example, improvements on a farm are an element or factor of value that must be considered in determining what the farm is worth on the market. But, it is firmly settled that one does not value the farmland as one factor and then value the improvements as another factor and then add the two values to determine market value. That is true because the value of the improved property may be greater than, equal to, or even less than the property in its unimproved state.
 
 
 45
 In the case of land that is underlaid with marketable minerals, including plastic clay, the existence of those minerals is a factor of value to be considered in determining the market value of the property, but the landowner is not entitled to have the surface value of the land and the value of underlying minerals aggregated to determine market value. The value of the mineral deposit is to be considered only to the extent to which it goes into and affects the over-all market value of the property. And it is generally not permissible to determine the value of a mineral deposit by estimating the number of tons in place and then multiplying the tonnage by a unit price per ton. See United States v. 599.86 Acres of Land in Johnson and Logan Counties, Ark., 240 F.Supp. 563, 572-73 (W.D.Ark.1965), Aff'd sub nom. Mills v. United States, 363 F.2d 78 (8th Cir. 1966), and cases cited in both opinions.[4] See also United States v. 620 Acres of Land in Marion County, Ark., 101 F.Supp. 686 (W.D.Ark.1952),[5] and the comprehensive set of instructions that were given by the late District Judge Harry J. Lemley in United States v. 2,350.2 Acres of Land in Pike County, Ark., 10 F.R.D. 293, 309-20 (W.D.Ark.).[6]
 
 
 46
 The taking of a tract of land or part of a tract by the government may not only deprive the landowner of his property but may also inflict upon him incidental or consequential damages. While the rule may appear unjust, it is well settled that the landowner is not entitled, at least within the framework of a condemnation suit, to be compensated for such consequential damages as loss of business, relocation expenses, and the like. See, e. g., Kimball Laundry Co. v. United States, 338 U.S. 1, 11-12, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); United States v. Petty Motor Co., 327 U.S. 372, 377-78, 66 S.Ct. 596, 90 L.Ed. 729 (1946); United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 281-86, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); United States v. 967,905 Acres of Land in Cook, et al. Counties, Minn., supra, 447 F.2d at 768-69.
 
 II.
 
 47
 When the evidence in this case is viewed, as it must be, in the light most favorable to CE, we think that there was substantial competent evidence to justify the jury in making a before and after market value award substantially in excess of the amounts testified to by the government's value witnesses. And if the case had been submitted to the jury on admissible evidence and on adequate and proper instructions, including cautionary instructions as to what the jury could and could not consider in arriving at its verdict, we would in all probability affirm the judgment of the district court without difficulty.
 
 
 48
 Unfortunately, from our consideration of the over-all record in the case, we are forced to the conclusion that the trial judge fell into plain and fundamental error in connection with the evidence and in connection with instructions, and that a new trial must be had regardless of whether the government's trial counsel made timely and proper objections to the evidence introduced by CE and regardless of whether he requested proper instructions, including cautionary instructions, and regardless of the fact that he did not object to the instructions ultimately given by the trial court. In other words, we apply to this case the "plain error" rule that is available in exceptional cases in which a trial court has committed serious error that seriously affected the rights of the losing party. See Morrow v. Greyhound Lines, Inc., 541 F.2d 713, 724 (8th Cir. 1976); University City, Mo. v. Home Fire & Marine Ins. Co., 114 F.2d 288, 294-95 (8th Cir. 1940). See also the qualifying language that appears in 28 U.S.C. § 2111, Fed.R.Civ.P. 61, and Fed.R.Evid. 103(d), which deal with "harmless error." Reference is made also to the discussion appearing in 11 Wright & Miller, Federal Practice & Procedure, §§ 2882 and 2883.[7]
 
 
 49
 The initial error committed was in permitting CE to introduce evidence going to establish its consequential damages, including loss of clay and the cost of restructuring its operation on the 50 acre tract. Those damages did not result from the taking but from CE's decision to continue to mine clay from the 50 acre tract and to do it in a certain way. Those damages were simply not compensable in this case, and evidence of them should have been excluded totally.
 
 
 50
 We think that additional serious error was committed when the district court permitted an aggregation of the estimated surface value of the 140 acres immediately prior to the taking and CE's estimated value of the clay underlying 20 of the 50 acres of land that were not taken, and in ignoring completely the surface value of the remaining 50 acres of land immediately after the taking.
 
 
 51
 We think also that the trial court erred when it permitted CE's managerial personnel, Mr. Scharthi and Mr. Porter, to make estimates of tonnage of clay in the ground and then multiply that tonnage by a fixed unit price. Such an approach is simply too speculative to be permissible. See Mr. Justice Blackmun's discussion in Mills v. United States, supra, 363 F.2d at 80-81; See also the other cases involving mineral deposits that have been cited.
 
 
 52
 This does not mean that CE was not entitled to prove that its property was underlaid with clay, that the clay was valuable and that it enhanced the over-all value of the property. And CE was entitled to show that the deposit of clay could be mined more efficiently if the 90 acres that the government took were available for utilization in connection with the mining operation. Such evidence might well lead the jury permissibly to infer that before the taking a reasonable seller would ask more for the over-all property due to the clay deposit, and that a reasonable buyer would pay more on account of the deposit; and a jury might permissibly infer that after the taking of the 90 acres the 50 remaining acres, including the 20 acres of clay, were worth less standing alone than they were worth as part of the larger original tract. But, we feel that the district court simply went too far in permitting the landowner to establish in the manner that has been described that the clay in the ground was worth over $600,000.00 and then permitting that figure to be added to a $1,000.00 per acre surface value of the property.
 
 
 53
 In any condemnation case it is quite likely that some questionable evidence will get into the record and that some items of evidence are admissible for limited purposes only. The problem frequently, if not generally, can be taken care of by cautionary instructions given at the time at which the evidence comes in or in the course of the final instructions given to the jury by the trial court, or by initial cautionary instructions followed by similar instructions in the court's final charge to the jury.
 
 
 54
 Unfortunately, the body of evidence in this case that we deem to have been inadmissible, or only conditionally admissible, was submitted without precautionary or limiting instructions, to a lay jury, the members of which could hardly be expected to be familiar with the technicalities of the law of eminent domain or to have knowledge of the proper method of determining just compensation in the case of a partial taking of lands, part of which were underlaid by a valuable clay deposit which was located on the part of the land that the government did not take.
 
 
 55
 To the credit of the inherent intelligence and common sense of the jurors, the jury did not accept at face value the testimony of either side. It awarded somewhat less than half of the amount sought by the landowner, but it awarded about eight times what the government was willing to pay. It is impossible for us to tell, however, the extent to which the jury considered incompetent evidence or the extent to which it accepted the method of valuation put forward by CE.
 
 
 56
 This is not a case in which an award of just compensation has been made by a district judge after a bench trial with the judge making adequate findings of fact and drawing adequate conclusions of law, nor is it a case tried before a commission as authorized by Fed.R.Civ.P. 71A(h) with the commission preparing a report complying with the requirements of United States v. Merz, 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964). In either of those situations this court would probably be able to tell the route that the fact finder followed in reaching an ultimate determination as to what would constitute just compensation for the taking. In this case it is not possible to follow the jury's line of reasoning or to know what evidence it accepted and what evidence it rejected, or what weight it gave to particular items of evidence.
 
 
 57
 It is true that as the trial proceeded counsel for the government did not request that limiting or cautionary instructions be given; it is also true that the instructions requested by him did not differ materially from those submitted on behalf of CE; and it is finally true that government counsel did not object to the instructions ultimately given by the district court and did not request any instructions particularly geared to the type of taking involved in this case. That, however, does not solve our problem as far as instructions are concerned.
 
 
 58
 The instructions that the district court gave to the jury were abstractly correct and would have been quite adequate in an uncomplicated case involving a partial taking of, say, agricultural land and where both sides had proceeded in the light of a correct understanding of the law. But, the instructions given in this case were inadequate in view of the nature of the case and the valuation problems that have been detailed.
 
 
 59
 A case of this kind involves more than a mere clash of private interests in which a trial judge may feel himself free to permit the course of litigation to be charted by the opposing lawyers. Land acquisitions in connection with projects like the Cannon Dam involve the expenditure of millions of dollars of public funds. A landowner whose property is taken in connection with such an acquisition is entitled to just compensation, but he is not entitled to be enriched, and he is not entitled to be paid for items of damage that are not legally compensable.
 
 
 60
 In trying a case of this kind, a federal district judge is under an independent obligation, at least to a reasonable extent, to see to it that the landowner's claim is submitted to the jury on competent evidence, and with the jury being given proper legal guidelines for decision.
 
 
 61
 That course was not followed in this case, and the judgment of the district court is reversed and the cause remanded for a new trial.
 
 
 
 *
 The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 Refractory materials used to line industrial kilns and furnaces consist of heat resistant clays and perhaps other ceramic materials
 
 
 [2]
 It appears that overburden taken from the clay deposit was pushed by a bulldozer onto the 90 acre tract and was dumped principally into one or perhaps both of the ravines that have been mentioned. And CE claimed that there were additional advantages to owning the 90 acre tract as an adjunct to the 50 acre tract and particularly as an adjunct to the 20 acre tract where the clay was located
 
 
 [3]
 As above stated, the date of taking disclosed by the record was December 16, 1976, and the plan in question was not devised until shortly before the commencement of the trial on October 13, 1977. Thus, it may be doubted that the plan had been implemented to any substantial extent during the trial period
 
 
 [4]
 The opinion of the district court was written by then Chief, now Senior, District Judge John E. Miller of Fort Smith, Arkansas, who has had a great deal of experience in eminent domain litigation. The opinion of this court was written by Circuit Judge (now Mr. Justice) Blackmun. Those opinions contain good general reviews of the over-all law of just compensation in eminent domain cases
 
 
 [5]
 That opinion was also written by Judge Miller
 
 
 [6]
 The published opinion bears no date. However, the writer is reliably advised that the opinion was filed about 1950
 
 
 [7]
 The question of whether the government's trial counsel made a proper record in the course of the trial is sharply disputed. We find it unnecessary to decide the question. We do think that in the matter of objections to evidence and in the matter of instructions government counsel should perhaps have been more specific and more insistent in making the government's positions clear to the trial court