**UNITED STATES of America, Plaintiff,**

v.

**100.80 ACRES OF LAND,**
etc., **Defendant.**

**No. C–81–622–D.**

United States District Court,
M.D. North Carolina,
Durham Division.

March 27, 1987.
As Corrected May 7, 1987.

Kenneth W. McAllister, U.S. Atty., Richard L. Robertson, Asst. U.S. Atty., Greensboro, N.C., for plaintiff.

Lester W. Owen, Richard H. Harper, Patti Owen Harper, Durham, N.C., for defendant.

## MEMORANDUM OPINION AND ORDER

**HIRAM H. WARD, Chief Judge.**

This matter comes before the Court on the government's Objections To the Report and Award of Commission Filed September 9, 1986 (September 19, 1986). The instant case involves the taking of a tract of land owned by Bobby Parrish by the United States under the power of eminent domain. In its second Report and Award, the Commission recommended $506,769.00 as just compensation. The dispute over just compensation focuses on the sand bearing parcel of tract No. 760, denominated as Parcel B. Finding the Commission's findings of fact to be supported by substantial evidence, the Court will affirm them. However, the Court will modify the formula used to compute the present value[1] of the sand in place, and therefore, modify the Commission's award.

## FACTS

On October 14, 1981, the United States filed a Declaration of Taking and a Complaint In Condemnation for tract No. 760 owned by Bobby Parrish.[2] The government deposited $161,100.00 in the registry account as estimated compensation. De-

fendant filed a Notice Of Claim Of Mineral Deposits on August 12, 1982. The Land Commission held its first hearing on just compensation and subsequently filed its first Report and Award on September 10, 1984. The Commission divided the tract into two parcels to compute compensation. Parcel A (60.96 acres) was valued at $94,735.00 and Parcel B (40.11 acres) was valued at $248,600.00.

Neither party objected to the valuation of Parcel A; however, both parties objected to the valuation of Parcel B, the sand bearing parcel. The Parrish sand deposit is an isolated deposit located in Durham County, North Carolina. The Court remanded the case to the Commission by Order dated February 15, 1985. The remand covered the issues of future market demand for the sand, discount rate, and computation of the value of the sand in place.

The Commission held a second hearing and subsequently filed its second Report and Award on September 9, 1986. The second Report and Award valued Parcel A at $94,735.00 and Parcel B at $412,034.00.[3] The government filed objections to the second Report and Award; the landowners did not. The Court heard oral argument on the government's objections on December 2, 1986 rendering this matter ready for resolution.

## DISCUSSION

### I. Standard of Review

The Court will briefly outline the standard of review applicable to the Commission's Report and Award. Federal Rule of Civil Procedure 71A governs the procedural aspects of a condemnation of property case and states in pertinent part:

> If a commission is appointed it shall have the powers of a master provided in subdivision (c) of Rule 53 and proceedings

---

1. "Present Value" in this context, and throughout this opinion, refers to the fair market value on the date of taking.

2. Adjacent property, denominated as tracts Nos. 733–1, –2, & –3, is the subject of similar proceedings, C–82–796–MF–D, C–82–797–D, and C–82–798–D.

3. The Commission derived the total value of Parcel B from a value for the sand in place ($405,063.00) and residual value for the land after mining is completed ($6,971.00).

before it shall be governed by the provisions of paragraphs (1) and (2) of subdivision (d) of Rule 53. Its action and report shall be determined by a majority and its findings and report shall have the effect, and be dealt with by the court in accordance with the practice, prescribed in paragraph (2) of subdivision (e) of Rule 53.

Fed.R.Civ.P. 71A(h). Rule 53(e)(2) states:

In an action to be tried without a jury the court shall accept the [commission's] findings of *fact* unless *clearly erroneous* .... [A]ny party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion.... The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.

Fed.R.Civ.P. 53(e)(2) (emphasis added).

In order that findings may be reviewed under the "clearly erroneous" standard, commissioners must state more than conclusory findings, but must "reveal the reasoning they use in deciding on a particular standard they try to follow, which line of testimony they adopt, ... and so on." *United States v. Merz*, 376 U.S. 192, 198, 84 S.Ct. 639, 643, 11 L.Ed.2d 629, 634 (1964). In other words, "[t]he path followed by the commissioners in reaching the amount of the award [should] be distinctly marked." *Id.*, 376 U.S. at 199, 84 S.Ct. at 643, 11 L.Ed.2d at 634.

## II. Material Matters Not In Issue

Before focusing on the government's objections to the second Report and Award, the Court will summarize those material matters not presently in issue. Certain of the findings in the first Report and Award were established because neither party objected to them. Neither party objected to the valuation of Parcel A at $94,735.00. No objections were made to the first Report and Award's findings as to the quality and quantity of sand on Parcel B, thus establishing that Parcel B contained 999,-782 extractable tons of *commercial quality* sand. In addition, the government did not object to the Commission's finding that the highest and best use of Parcel B is as a commercial sand operation on any basis related to the physical structure or composition of the sand deposit.

On the other hand, the government objected to the first Report and Award's findings related to the future market demand for the Parrish sand and to the appropriate discount rate, and objected to the Commission's alleged use of a hypothetical business valuation method. The Court's remand covered these matters; and thereafter, the Commission conducted a further evidentiary hearing.

In its second Report and Award, the Commission found a sufficient future market demand to absorb the production of sand from tract No. 760 even if the adjacent Wade Parrish tract were developed. It found a depletion time of 12.497 years for tract No. 760. Additionally, the Commission found a discount rate of 19.72%[4] to be appropriate for computing the present value of the sand in place. Neither party objected to the above mentioned findings in the second Report and Award. Therefore, the existence of a future demand for the sand, a depletion time of 12.497 years, and the appropriate discount rate are no longer in issue. Additionally, the government did not object to the Commission's finding that the highest and best use of Parcel B was as a sand pit[5] or to the Commission's attempting to determine the value of the sand in place as relevant to the measure of just compensation.[6]

---

4. The Commission rounded off the discount rate to 19.75% for its calculations.

5. The Court finds that the record supports the Commission's finding that start up costs would not deter commercial exploitation of the Parrish sand as such costs are recoverable over the depletion term.

6. The government objects to the method by which the Commission valued the sand in place on Parcel B but did not object to the sand's being valued in place as a means to determine just compensation.

To summarize, at this stage of the litigation the parties do not dispute the following: (1) the highest and best use of Parcel B is for a commercial sand pit, (2) Parcel B contains 999,782 extractable tons of commercial quality sand, (3) valuing the sand is relevant to determining just compensation, (4) the future market demand is sufficient to absorb the sand, and the depletion time for Parcel B's sand is 12.497 years, and (5) the appropriate discount rate is 19.72%.

### III. The Government's Objections To The Second Report and Award

The government challenges the second Report and Award by listing three objections. However, the government's objections are essentially twofold and as follows: first, the Commission's computation of the value of the sand on Parcel B was without a substantial evidentiary basis because it was not supported by evidence of royalty rates paid in the market place as of the date of taking; second, the exclusion of the testimony of Mr. Thomas Gould and Mr. Harry Britt was clearly erroneous.

The Commission, in accordance with *Merz*, made clear the path by which it reached its conclusion on just compensation. Specifically, the Commission took a *royalty* capitalization approach to the value of the sand in place because no comparable *sales* were available. The Court notes that the Commission did not label its approach "royalty capitalization." However, by deriving a $1.00 per ton value for the sand *in place*, it in essence determined the value attributable to the sand itself which is a royalty value. The Commission then used the $1.00 per ton to compute the present value of the sand deposit, thus in effect capitalizing a royalty value. (Report and Award at 109–111). The Commission rejected the government's claim that certain mineral and sand leases, tendered through its witnesses Arnold and Gould, were comparable to Parcel B. Thus, the Commission rejected the government's opinion as to the appropriate royalty rate per ton of sand to be used in the capitalization formula.

Finding that no comparable *leases* existed, the Commission applied a royalty capitalization approach relying on the opinions of experts to determine an appropriate *royalty* rate. Particularly, the Commission's determination of a $1.00 per ton royalty rate is supported by the testimony of Dr. Lang, an expert for the landowners.

The Commission and Dr. Lang did *not* use a capitalization of *profit* or *operator* income approach, but did use a capitalization of *royalty* income approach. The Commission derived a yearly stream of income from the total-tonnage, the number of years to deplete the sand, and the royalty rate of one dollar per ton. This yielded $80,000 per year which the Commission simply divided by 19.75% (the rounded off discount rate) to arrive at a present capitalized value of the sand in place of $405,063.00.

In reviewing the Commission's award, the Court will: first, address whether the capitalization of royalty approach is appropriate in this case; second, address whether the method by which the Commission determined an appropriate royalty rate is correct; third, address whether the royalty rate found by the Commission is supported by substantial evidence; fourth, review the formula used to capitalize to present value; and lastly, consider whether the Commission erroneously excluded the testimony of Mr. Gould and Mr. Britt.

■ When the government exercises the power of eminent domain, the fifth amendment to the United States Constitution assures "just compensation," which is the value of the property at the time of the taking. 4 J. Sackman, *Nichols' The Law Of Eminent Domain* § 12.1, at 12–5 (1979) [hereinafter *Nichols'*]. The general rule is that the value of taken property is its fair market value. *Id.* § 12.1, at 12–12. Fair market value equals the amount a willing purchaser would pay a willing buyer taking into account all the uses for which the land is reasonably suited. *Id.* § 12.2[1], at 12–71. Fair market value comprehends all reasonable uses whether the land is presently so used or intended to be so used. *Id.* § 12.2[3], at 12–96 to –97. All elements of value merit consideration such that every element which would influence a prudent purchaser should be considered. *Id.*

§§ 12.1, 12.31[2], at 12–6, 12–140. Land is valued in light of its highest and best use. *Id.* § 12.3142, at 12–306. Existence of mineral deposits in the subject property is an element in determining fair market value. *Id.* § 13.21[1], at 13–119.

■ The best method of determining fair market value is to use comparable sales. *United States v. Whitehurst*, 337 F.2d 765, 775 (4th Cir.1964). However, in the instant case there are no comparable sales from which to derive a value of the subject property for its highest and best use.[7] Valuation is a difficult process; therefore, if the proof offered is the best available and enables the trier of fact to make an informed estimate of value, it is sufficient. 4 *Nichols'* § 12.1, at 12–39 to –40.

Where no comparable sales exist, the income approach is the next best approach to valuation. *Id.* § 12.312, at 12–181. The Fourth Circuit has stated that it does not reject the capitalization of income method if all the necessary factors are in evidence. *Whitehurst*, 337 F.2d at 776.[8] Additionally, the Fourth Circuit approved a Tenth Circuit opinion as containing an appropriate discussion of whether the discounted royalty method is acceptable. *See United States v. Upper Potomac Properties Corp.*, 448 F.2d 913, 917 (4th Cir.1971) (citing *United States v. Sowards*, 370 F.2d 87 (10th Cir.1966)).

The *Sowards* court noted the dangers present in the discounted royalty method: specifically, the dangers of speculation about future market demand and the vagaries of operating a business. *See Sowards*, 370 F.2d at 90. However, the Tenth Circuit recognized that an eminent domain taking is not a voluntary transfer, and therefore, that just compensation "must of necessity be determined by an estimate based upon the best available criteria of value." *See Id.* at 91–92. Recog-

nizing the burden of proof to be on the landowner, the *Sowards* court concluded that:

> Qualified and knowledgeable witnesses may give their opinion or estimate of the value of the property taken, but to have probative value, that opinion or estimate must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption. It must have a rational foundation.

*Id.* at 92.

■ Reviewing the decision to use a discounted (or capitalization of) royalty method in light of the above principles, the Court concludes that the Commission was correct. In view of Parcel B's highest and best use for sand mining, no comparable sales existed from which the Commission could derive a fair estimate of value. The existence of a future market demand has been copiously supported by the testimony of Dr. Staelin, Dr. Lang, and Mr. Reid. Indeed the Court will not spend time reviewing this point as the government did not object to the Commission's finding of a future market demand for the Parrish sand. Finally, the Court notes that Dr. Lang, a distinguished expert, did not engage in speculation about the vagaries of a sand mining operation but focused upon the *royalty* value of the sand. Dr. Lang was careful to rely on the income generable by the *mineral* itself (a royalty)—which is correctly attributable to the value of the land—and did *not* rely on an estimate of an operator's *profit*—which would not be attributable to the land. Therefore, the Commission's use of the discounted royalty method was not only appropriate, it was a necessity given the unique facts of the case *sub judice.*

■ This brings the Court to the heart of the government's objections. The

---

**7.** The record supports that the Parrish sand deposit is unique in its location and relation to the market, and therefore, that no comparable sales exist; the government adduced no comparable sales for the property's highest and best use.

**8.** The *Whitehurst* case did not reject the capitalization of income approach but rather held under the facts of the case, that the approach was

unsupported because the record did not establish a future market demand or the appropriate discount rate. *Whitehurst*, 337 F.2d at 771–72. Both of these factors are supported in the record in the instant case, and neither party has objected to the Commission's findings relevant to them.

government contends that the Commission's valuation is clearly erroneous because the royalty rate used was not based on evidence of actual comparable *royalties* paid in the market place. The Court agrees with the government that where comparable royalty leases exist, they are the best evidence of an appropriate rate to be used in the discounted royalty method. However, the Court also believes that the principles applicable to situations in which no comparable sales exist are instructive regarding situations in which no precisely comparable royalty leases exist. Thus, even if no precisely comparable leases exist, the trier of fact in a condemnation case must not abandon its Constitutional mandate to estimate fair value if a *rational* estimate of an appropriate royalty rate can be made based upon the *nonspeculative* testimony of an expert. Based upon the unique facts of this case, the Commission necessarily relied upon the testimony of an expert to determine an appropriate royalty rate to use in the capitalization method. Believing Dr. Lang's testimony to be substantial, rational, nonspeculative, credible, and based upon the realities of the market place, the Court holds the Commission's method of determining the royalty rate, in reliance on his testimony, correct and supported by substantial evidence.

Dr. Lang qualified as an expert in the field of mineral appraisal and economic geology before the Commission at its second hearing. (Commission Rehearing Transcript filed January 6, 1986 at 131–32 [hereinafter Rehearing Transcript]). Dr. Lang was highly qualified to testify as an expert by virtue of education, training, and work experience. (Rehearing Transcript at 122–131). Dr. Lang has done seventy-five to one hundred mineral appraisals in condemnation situations, working on behalf of the government in about 90% of those cases. (*See Id.* at 130). Indeed the Eighth Circuit has recognized Dr. Lang as a "distinguished expert in the field of geology." *United States v. 91.90 Acres of Land,* 586 F.2d 79, 85 (8th Cir.1978).

Dr. Lang's testimony indicates that no precisely comparable royalty leases existed from which the Commission could simply extrapolate a royalty for Parcel B. Along with others, Dr. Lang testified that the Parrish sand deposit is unique because it is an isolated deposit with a distinct locational[9] advantage over other sand deposits in relation to a very substantial market. (*Id.* at 190). (*See generally* Rehearing Transcript at 13, 24 (testimony of Bobby Caulberg); *Id.* at 80–81 (testimony of Dr. Staelin and associated Report denominated as Defendant's Rehearing Exhibit No. one); *Id.* at 373–74 (testimony of government witness, J. Thomas Gould)). Indeed, Dr. Lang stated: "I have never seen such an isolated deposit in such a hot market." (*Id.* at 213). He stated: "[T]here is no going [royalty] rate in a five-mile radius, in a ten-mile radius, in a fifteen-mile radius, and a twenty-five mile radius." (*Id.* at 195).

On the other hand, the government contends that comparable leases exist; and therefore, the Commission erred in not relying upon them in determining the royalty rate. The government attempted to establish comparable sand leases primarily through the testimony of Mr. L.A. Arnold, several documents, and the testimony of Mr. Gould.[10]

---

**9.** Sand is a mineral with a high *place* value and a low *unit* value, meaning that its value is derived largely from its closeness to the place where it is needed and used. (Rehearing Transcript at 78, 128, 135).

**10.** Specifically, the government relies on the following: (1) a lease agreement between Wade and Bobby Parrish dated November 2, 1980, for 5 cents per cubic yard; (2) a lease agreement between Wade and Nancy Parrish and the Nello Teer Co., dated July 31, 1969, for 5 cents per cubic yard; (3) an option lease agreement between Mr. and Mrs. Edwards and Crushed Stone Consultants, Inc. for 7 cents per ton or two percent of overage sales FOB; (4) a similar lease-option agreement between the same parties dated February 16, 1984, for 7 cents per ton of *rock;* (5) an option-lease agreement between certain parties and Crushed Stone Consultants, Inc. dated February 24, 1984, for 7 cents royalties or two percent of sales; (6) a letter from a Mr. Gould who is vice president of Nello Teer Co. which according to Mr. Arnold, stated that royalty rates ranged from five to 10 cents per ton; (7) a 1970 contract between Wade Parrish and Nello Teer Co. for $1.00 per ton of sand "FOB Teer trucks."

■ Rule 702 of the Federal Rules of Evidence allows a witness who is qualified as an expert by knowledge, skill, experience, training or education to give an opinion regarding scientific, technical, or other specialized knowledge that will assist the trier of fact. Thus, the issue arises whether Mr. Arnold was competent to express an opinion on the comparability of certain mineral leases to the case at bar. Mr. Arnold indicated he is not an expert in the field of geology. (Rehearing Transcript at 397). Mr. Arnold testified that he has no knowledge of the mineral industry nor of mineral excavation. (*Id.* at 398). Although qualified as an expert in real estate appraisal, Mr. Arnold made clear that his expertise did not extend to minerals; neither was any foundation laid that expertise in non-mineral real estate appraisal was sufficient to qualify one to appraise mineral bearing property.[11]

Mr. Arnold laid no foundation that the documents proffered by the government were relevant to the subject property on the *date* of taking, which was 1981. When asked why he resorted to marketplace information, Mr. Arnold stated: "Because this is what's happening between buyers and sellers in the marketplace—lessees and lessors in the marketplace. This is where it's happening.... These are transactions agreed to by two different people." (Rehearing Transcript at 411). Indeed, on cross examination, Mr. Arnold indicated that he would hate to use a decade old sale as a comparable sale. (*Id.* at 436).

In light of Mr. Arnold's lack of qualification to appraise mineral bearing land and the nature of his testimony, the Court believes the Commission was entirely correct in rejecting his conclusion regarding comparable royalty leases. (*See* Report and Award at 99–100). The Commission's re-jection of the government's alleged comparables is also fully supported by the testimony of the landowners' experts. For example, Dr. Lang's testimony indicated that the 1969 Parrish-Teer Co. lease is outside the range of interest as royalty rates have drastically changed since 1969, a time which he considered to be a remote era from 1981, the date of taking. (Rehearing Transcript at 198–99).

Additionally, Dr. Lang testified that market royalty leases for land without proven sand reserves are not comparable to the case at bar which involves land with a proven, nonspeculative reserve of commercial quality sand.[12] (Rehearing Transcript at 215). Mr. J.R. Reid explained that the agreement involving Crushed Stone Consultants, Inc. were not *sand* leases, but were leases primarily for unproven deposits of *rock*. (*Id.* at 350, 331–342). Regarding Mr. Gould's testimony about the royalty price paid for sand by Nello Teer Co. [hereinafter Teer Co.], he did not lay a foundation for comparability. Specifically, Mr. Gould did not address whether the rate paid by Teer Co. was based on leases entered into at a time relevant to the date of taking nor did he address whether the leases were for *proven* as opposed to *unproven* sand deposits. In addition, Mr. Gould did not testify that the Parrish deposit was comparable to the deposits from which Teer Co. purchased sand.

Therefore, the Commission's finding that precisely comparable royalty leases did not exist in the relevant market (Report and Award at 98) is supported by substantial evidence. Furthermore, the Commission's reliance on the best evidence available, that is on expert testimony, to determine the appropriate royalty rate was correct if testimony in support thereof was rational, nonspeculative and substantial.[13] Thus,

---

11. The landowners objected several times to Mr. Arnold's giving testimony as an expert in mineral appraisal.

12. Dr. Lang's testimony indicated that *proven up* deposits are normally only subject to transactions between operators. (Rehearing Transcript at 250). His testimony is *not* directed to an individual negotiation, but to the effect knowledge of a deposit has on the marketplace.

13. The government argues that the *Oldfield* decision controls the instant case. In *Oldfield* the court rejected an expert's opinion on the royalty rate of coal, expressing two main concerns. The court was troubled first with the expert's focus on what an operator could afford to pay; and second, with the evidence of 50 coal tract leases which strongly suggested a "going rate" in the marketplace. *United States v. 103.38 Acres of Land,* 660 F.2d 208, 214 (6th Cir.1981) (re-

the Court will now briefly review the evidence which supports the Commission's finding of a $1.00 per ton royalty.

■ The Court need not reiterate Dr. Lang's credentials except to note that they are impressive. Dr. Lang made clear that he directed his discounted royalty analysis to determining the net income from the sand itself, not the income from some business associated with it. (Rehearing Transcript at 178–79). Dr. Lang concluded that an appropriate royalty rate is $1.20 per ton. He computed this by taking a basic royalty rate and making adjustments based on the proven nature of the sand at issue and the locational advantage the Parrish sand enjoys in relation to the demand. Dr. Lang relied on market and economic realities to derive his opinion on a royalty. Specifically, his basic royalty rate was supported by his knowledge of the percentage correlation between royalty rates and FOB price prevailing in the market place for typical royalty leases. The record is also replete with evidence supporting that the value of land with a *proven* sand deposit is greatly enhanced over the value of land with a mere prospect of a sand deposit and that a willing buyer would be influenced by whether sand was proven or contingent. Additionally, the record amply supports that a sand deposit *strategically* and *uniquely* located with respect to the market demand will enjoy a substantial value enhancement.[14] This results from the importance of hauling costs to the delivered cost of sand and means that sand with a haul advantage may command a higher

FOB price at the pit. The record also supports that a haul advantage enhances the value of sand in place and hence its royalty value. Therefore, the Court finds Dr. Lang's testimony to be rational, nonspeculative, derived from economic realities, and in support of the Commission's finding of a $1.00 per ton royalty.

Other probative evidence supports the Commission's finding. Harold Blaylock, who deals in sand, testified that he purchases sand from a tract owned by Billy Parrish which adjoins the Bobby Parrish tract. (Original Hearing Transcript filed December 29, 1983 at 3–47 to –50). Mr. Blaylock stated that he pays $1.00 per ton of sand in bank and that he digs it, mines it, and washes it. (*Id.* at 3–50). Mr. William Andrews, Jr. who owns a tract of land about six miles from the Parrish tract values his sand in the ground at ten dollars an eight ton load or at about $1.25 per ton. (*Id.* at 2–26 to –27, 2–34, 2–36, 2–49). Mr. Andrews' sand is sold as fill sand (not being graded and cannot be used for concrete, mortar, or filter bed sand. (*Id.* at 2–23 to –24). According to Wade Parrish, Mr. Gould (a government witness) indicated to him that the sand was worth $1.00 per ton. (Rehearing Transcript at 461). Additionally, the Commission heard other expert testimony which was consistent with Dr. Lang's valuation.

Charged with an extremely difficult task, and unaided by any expert mineral *appraisal* testimony on behalf of the government, the Commission heard the best avail-

ferred to as *Oldfield*). The facts of the instant case are distinguishable from *Oldfield*. Instead of having 50 comparable leases, the leases proffered by the government were either demonstrably disimilar or without any foundation to show comparability. Indeed the evidence shows the Parrish tract to be unique because of its relation to a substantial market demand and its certainty. Additionally, Dr. Lang did not focus on what an operator could afford to pay but took into account how the certainty of the Parrish sand and its strategic location enhanced its value. Also, there was direct evidence in this case which supports the one dollar per ton royalty found by the Commission by virtue of the testimony of Mr. Blaylock and Mr. Andrews. Under the record, the Court *cannot* find that the Commission's reliance on Dr. Lang's testimony was

clearly erroneous as not related to actual economic realities. Therefore, *Oldfield* does not control the case at bar.

**14.** Dr. Lang addressed the possibility of joint or separate development of the Bobby and Wade Parrish tracts concluding $1.20 per ton appropriate if joint development and a twenty-five per cent reduction if separate development. (Rehearing Transcript at 254–55). The Commission adopted a royalty rate closer to Dr. Lang's lower figure than his higher figure. The Court believes this is consistent with valuing the Bobby Parrish tract and with taking into account the effect its location in relation to other tracts would have on willing buyers, and thus, the fair market value.

able evidence relevant to the value of Parcel B. The Commission through a discounted royalty method sought to determine the value of the sand bearing parcel of land, *not* the value of a sand *operation.* Viewing the record as a whole, the Court cannot conclude that the Commission's *factual* finding of a royalty rate of $1.00 per ton was "clearly erroneous"; therefore, such finding must be affirmed.

■ The Court will now turn to examine the formula used to determine the present value of Parcel B as of the date of taking. The Commission divided the tonnage of sand, 999,782 tons, by the depletion rate, 80,000 tons per year, to derive a depletion term of 12.497 years. The Commission computed the gross value of the sand in place to be 999,782.00 tons times $1.00 per ton royalty, or $999,782.00. To determine the yearly income stream, the Commission divided $999,782.00 by 12.497 years yielding $80,000 per year. The Commission then capitalized the income stream by dividing it by the discount rate of 19.75% to yield a value of the sand in place on the date of taking of $405,063.00. Although the Court notes that the Commission used a capitalization formula alluded to in a prior order, that formula fails to reduce the income stream to its present value as of the date of taking. The formula used, which simply divides the income stream by the discount rate, assumes the *futurity* of the income; that is, it assumes the income stream will continue *indefinitely* into the future. However, the case at bar involves land containing a depletable resource which according to the unobjected to finding of the Commission would generate an income stream for only 12.497 years. Therefore, for a formula to correctly capitalize the royalty income stream, it must take into account the *term* over which the income stream would be received as well as taking into account the amount of the yearly income and the discount rate. In other words, the present value of an income

stream for a definite duration is determined by three variables: (a) the amount of income per unit time; (b) the discount rate; and (c) term over which the income will continue.

The Court believes the Morkill formula, testified to by Dr. Lang, properly reduces an income stream to present value for the purpose of this case. (Rehearing Transcript at 178; Defendant's Exhibit RH–4 at 23). Therefore, the Court will recompute the value of the sand in place using the Morkill formula and the factual predicates found by the Commission. Specifically, the Court will determine the present value of $80,000 per year for 12.497 years at a discount rate of 19.72%. Using these predicates, the Morkill formula yields a result of $362,896.[15]

Accepting Dr. Lang's testimony, the Commission also determined Parcel B to have a residual value which would influence the fair market value at the time of taking. The Commission reduced the residual to its present value of $6,971. Neither party objected to this finding. Therefore, the total value of Parcel B is $369,867.00. This figure added to the unobjected to value of Parcel A ($94,735.00) yields a total value for tract No. 760 of $464,602.00. Thus, the landowners are entitled to $464,602.00 as just compensation for tract No. 760 as of the date of taking.

A final issue exists regarding the government's contention that the Commission clearly erred by excluding the testimony of Mr. Thomas Gould and Mr. Harry Britt. The government's argument assumes that the Commission totally excluded the testimony of Mr. Gould and Mr. Britt. (*See* Memorandum In Support Of Objections To Report And Award Of Commission filed September 9, 1986 at 7 [hereinafter Government's Memorandum]). However, this is not the case; in its findings of fact, the Commission stated:

17. The Commission notes that the Government's list of expert witness-

---

**15.** The Morkill formula is as follows:

$$PV_1 = Pmt \frac{(1 + i)^n - 1}{i (1 + i)^n} .$$

$PV_1$ = present value, Pmt = annuity income, $i$ = risk interest rate expressed as a decimal fraction, and $n$ = number of years the income is received.

es and exhibits which was filed prior to the rehearing stated that the plaintiff would call Mr. J. Thomas Gould and Mr. Harry Britt as expert witnesses, the Commission finds as a fact that neither Gould nor Britt were offered as experts at the rehearing. However, the Commission is aware that *Instructions to Commissioners* No. 7(2) permits laymen with knowledge of the market value of property in the vicinity of the subject property, which is based in part on personal observation or experience, to give an opinion as to value and the testimony of these two witnesses was viewed in this respect and given such weight as the Commission determined.

18. The Commission finds as a fact that much of Mr. Gould's testimony which was offered on the issue of marketability actually went to the issues of quantity and quality, which were not proper topics of consideration at the rehearing. As Judge Ward noted in his Memorandum Opinion and Order filed February 15, 1985, "the Commission found no evidence contradicting defendant's witness Reid's testimony as to the quantity and quality of the sand." Clearly, the cases were not remanded for further evidence on those issues, and any such testimony was not considered by the Commission.

(Report and Award at 83–84). Thus, the Commission considered Mr. Gould's and Mr. Britt's testimony as lay evidence where relevant to valuation, and it explicitly excluded Mr. Gould's testimony only where it went to the issues of quantity and quality of the sand deposit.

In its brief, the government characterizes Mr. Gould as the most knowledgeable expert regarding the sand market in Durham County and complains that the Commission excluded his testimony about actual royalties paid by Teer Co. for sand. (Government's Memorandum at 7–8). The Court believes the record establishes that the Commission considered Mr. Gould's tes-

timony about royalties paid by Teer Co. but found that the landowner's evidence outweighed it. Additionally, the government never offered Mr. Gould or Mr. Britt as experts; therefore, the Commission did not err in treating them as lay witnesses. (*See* Rehearing Transcript at 359–88).

█ The government also alleges in brief that the Commission incorrectly excluded Mr. Gould's and Mr. Britt's testimony about on site tests of the contiguous Wade Parrish tract. In its Initial Report and Award, the Commission found as a fact that 999,782 *extractable* tons of commercial quality sand existed on Parcel B. (Report and Award of Commission filed September 10, 1984 ¶¶ 11, 12, at 5 [hereinafter Initial Report and Award]). Neither party objected to this finding; therefore, quantity and quality were not in issue on remand nor at the rehearing. Thus, evidence probative only of quality and quantity was correctly excludable at the rehearing, and the Commission did not err. In its initial report, the Commission also found the highest and best use of Parcel B to be for the exploitation or commercial mining of the sand deposit located thereon. (*Id.* at 13). The government did not challenge this finding on a basis related to the physical structure of the sand deposit. Additionally, the Court observes that in light of the Commission's finding that the tonnage was *extractable* and the highest use was for sand, neither Mr. Gould nor Mr. Britt laid a foundation to relate testimony about Teer Co. tests of the Wade Parrish sand to the royalty value of the sand.

The government also argues equitable estoppel alleging that *Wade* Parrish misled the government effectively denying it "the opportunity to become aware of the facts surrounding Wade Parrish's dealings with Nello Teer at an early date." (Government's Memorandum at 8). In essence, the government is arguing that *Bobby* Parrish should be estopped from objecting to testimony at the rehearing on the quality and quantity of the sand deposit because his brother Wade allegedly kept from the government information about Teer Co.'s testing of the sand, thus preventing the

government from adducing such evidence earlier.

The Court has carefully reviewed the interrogatories and oral testimony that the government contends were deceptive and finds that the statements were not misleading but rather informed the government of Teer Co.'s dealings with the Parrish sand at an early stage. The answer to interrogatory one indicates Teer's involvement with the sand and that the landowners had entered into contracts with Teer Co. The interrogatory was directed to *mining activity,* and the answer in no way tried to conceal that Teer Co. had been involved with mining Parrish sand. (*See* Government's Memorandum at 9). Therefore, prior to the first hearing, the government was on notice of the possible relevance of information possessed by Teer Co. employees and cannot now claim that it did not have an opportunity to make a reasonable investigation.

Furthermore, Wade Parrish's testimony at the Initial Hearing clearly indicated that Teer Co. had drilled test holes at the Parrish deposit. (Initial Hearing Transcript in C–82–796–MF–D at 53–54). The government contends that this testimony was materially misleading in that it indicated that Teer was aware that a mineable deposit existed. However, upon a review of the testimony cited in the government's brief, the Court finds that Wade Parrish indicated only that Teer Co. had done some drilling and that from the drilling Wade Parrish believed he had a great quantity of sand. The testimony did not address the sand's mineability or conclusions by Teer Co. about mineability, as contended by the government.

For the above reasons, the Court rejects the government's estoppel argument. In summary, the Court concludes that the Commission did not err in its treatment of the testimony by Mr. Gould nor by Mr. Britt.

IT IS, THEREFORE, ORDERED that the government's Objections to the Report and Award of Land Commission be, and the same hereby are, OVERRULED.

IT IS FURTHER ORDERED that the Report of the Land Commission *as modified* by this Memorandum Opinion and Order be, and the same hereby is, CONFIRMED AND APPROVED and is hereby ADOPTED as the findings and conclusions of this Court.

IT IS FURTHER ORDERED that the Award of the Land Commission be, and the same hereby is, MODIFIED to the amount of $464,602.00 as just compensation for tract No. 760 as of the date of its taking.

The parties are directed to confer and thereupon submit a proposed final judgment to the Court within thirty (30) days from the filing of this Order.