**ZEIGLER COAL COMPANY,**
Petitioner,

v.

**Morris SIEBERG, and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.**

No. 86–1995.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1987.
Decided Feb. 22, 1988.

Mark Solomons, Arter & Hadden, Washington, D.C., for petitioner.

Daniel J. Lesser, Freeman, Freeman & Salzman, Chicago, Ill., for respondents.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

BAUER, Chief Judge.

## I. FACTS

Zeigler Coal Company brings this appeal seeking relief from an award of benefits made to Morris Sieberg under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.* Sieberg worked as a coal miner for 25 years at Zeigler's Number 11 mine near Sparta, Illinois until his retirement in 1976. In approximately 1974, Sieberg began experiencing breathing difficulties that impaired his job performance. He is current-ly confined to a sedentary life style and requires daily use of a breathing machine.

In a March, 1983 hearing before Administrative Law Judge Robert J. Feldman, Sieberg received an award of Black Lung Benefits on the basis of two pulmonary function tests (PFTs). Based on the qualifying results of these two PFTs, Judge Feldman concluded that Sieberg was entitled to invocation of the "interim presumption" found at 20 C.F.R. § 727.203 (1978). That presumption acts as a burden-shifting device which upon invocation entitles the miner to Black Lung Benefits unless the employer demonstrates affirmatively that the miner does not suffer total disability due to coal mine employment-related pneumoconiosis. The question on appeal is whether the ALJ properly invoked the interim presumption given the medical evidence before him.

The ALJ reviewed the results of three different PFTs, each administered by medical technicians at the request of a physician. The first study (Study I) was performed on January 9, 1979, at the request of Dr. Bill Fulk for the Department of Labor. The testing report indicates an $FEV_1$ value of 2.1 and an MVV of 90 L./min., which falls below the applicable criteria for a miner of Sieberg's height, thus invoking the interim presumption. The administering technician noted that Sieberg's cooperation and effort during testing was "good". Dr. Fulk's report, however, indicates that he is not personally qualified to render a technical interpretation of the tracings accompanying the study. Zeigler offered letters of opinion submitted by two consulting physicians, Dr. Edwin Morgan and Dr. William H. Anderson. Dr. Morgan indicated that Study I was invalid because Sieberg failed to use "maximal effort during [the] entire forced expiration" and because the $FEV_1$ test was performed improperly. Dr. Anderson also noted that the $FEV_1$ test in Study I was improperly calculated and that the MVV calculation is "physiologically impossible".

A second PFT (Study II) was performed on July 13, 1979, at the request of Dr.

Thomas Dew on behalf of Zeigler. The testing report indicates "poor patient cooperation. Patient did either not understand test or chose not to cooperate." It is uncontested that Study II failed to yield any relevant information.

Study three (Study III) was conducted on November 26, 1980, at the request of Dr. Marvin Rosecran, Sieberg's personal physician. The test results indicate an $FEV_1$ value of 2.47 and an MVV of 65 L./min., which also fall below the published criteria for a miner of Sieberg's height. Dr. Rosecran's report notes that Sieberg's cooperation in performing the test was good. The technician administering the test, however, indicated that Sieberg's cooperation was only "fair". Dr. Rosecran was not present during the testing. Dr. Anderson's consulting report states that Study III was done "technically incorrectly" and that the MVV value was "physiologically impossible". Dr. Peter Tuteur, a third consulting physician, indicated that the "tracings on the forced expiratory volume maneuver, labeled 'FVC' are not reproducible, are regularly associated with poor initiation of a high expiratory flow and failure to sustain the expiratory effort...." He also noted that the "MVV maneuvers were associated with low tidal volumes, too low to be effective and efficient to achieve a true and valid MVV, and irregular breathing patterns, both within a single run and comparing one run to the other. Simply, the MVV is totally INVALID for interpretation." (Emphasis in original.)

After considering each of the PFTs as well as the consulting reports of Drs. Tuteur, Anderson, and Morgan, Judge Feldman concluded that invocation of the interim presumption was appropriate because Studies I and III yielded qualifying numerical results under 20 C.F.R. § 727.230(a)(2). The ALJ rejected the consulting physicians' opinions because "[t]heir evaluations were performed some significant time after the tests were administered and as outside consultants they had little familiarity with claimant or his medical condition, having never examined him and having merely been supplied with data concerning the tests in question."

In a decision and order of December 31, 1985, the Benefits Review Board affirmed Judge Feldman's award, concluding that the ALJ "could properly rely upon the pulmonary function studies of January 9, 1979 [Study I] and November 26, 1979 [Study III], ... since both studies met the standards set forth at 20 C.F.R. § 410.430." The Board later affirmed its decision in an *en banc* order released April 25, 1986, upholding the ALJ's rejection of the consulting physicians' opinions because their evaluations "took place a significant time after the date of the pulmonary function study."

## II. DISCUSSION

Where the claimant is a living miner, he may invoke the presumption of disability upon the establishment of any one of four grounds. *See* 20 C.F.R. § 727.203 (1978). The ALJ determined and Ziegler disputes that invocation was appropriate pursuant to Section 727.203(a)(2)—pulmonary function tests establishing the presence of a chronic respiratory or pulmonary disease as demonstrated by test results below certain threshold values. Where the levels obtained in PFTs, measuring respiratory activity and lung capacity, are equal to or less than those listed for the miner's height, and the study meets certain quality standards found at section 410.430 of the regulations, the miner is entitled to the presumption of disability. 20 C.F.R. § 727.203(a)(2).

■ Sieberg would have us adopt a "bright line" test in reviewing the validity of PFTs. Under this approach, qualifying results of a study, as a matter of law, would invoke a presumption of disability whenever the quality standards set forth at section 410.30 of the regulations were met. Such a litmus test, however, belies the very purpose of the quality standards themselves. Section 410.30 requires, *inter alia*, that three tracings accompany each study to permit independent verification of the test results. Sieberg's "bright line" test, as apparently adopted by the Board, makes the mere presence of the tracings sufficient to invoke the presumption of disability, re-

gardless of whether they clearly demonstrate the invalidity of the study. That a demonstrably invalid study should invoke a presumption merely because the required tracings which reveal that deficiency are present makes little sense. *Cf. Markus v. Old Ben Coal Co.*, 712 F.2d 322, 324 (7th Cir.1983) (affirming the ALJ's rejection of ventilatory studies in part because the ALJ found tracings "facially indicative of breathing not in accord with the normally required instructions"). Such a rule is inequitable, particularly here, where the rebuttal of that presumption is not satisfied merely by discrediting the PFTs, but instead requires the employer to prove the absence of total disability due to pneumoconiosis arising out of coal mine employment. We therefore reject the use of Sieberg's suggested bright line test.

■ Our inquiry, then, requires an examination of the ALJ's rationale for permitting invocation of the presumption. Judge Feldman credited Sieberg's PFT results over the consultant's determinations that the studies were invalid (1) because a significant period of time elapsed between administration of the tests and the consultant's evaluations and (2) because the consultants had not personally examined the claimant and therefore were unfamiliar with his medical condition. Sieberg concedes that the mere passage of time could not impair a consultant's ability to evaluate PFT tracings, and thus cannot support an affirmance of the ALJ's decision. Rather astonishingly, the Review Board sitting *en banc* affirmed on this very ground!

■ Though guarded, Sieberg avows somewhat greater enthusiasm for Judge Feldman's second rationale, contending that it has "some merit". In fact, however, there is no evidence in the record, substantial or otherwise, *see Peabody Coal Co. v. Benefits Review Board*, 560 F.2d 797, 802 (7th Cir.1977), to support the notion that a nonexamining physician is unqualified to render an opinion as to the validity of a PFT. Nor would the logic of requiring tracings support such a proposition. The Black Lung Regulations require tracings of each PFT for the very purpose of permit-

ting independent verification of the test results. Any notion that an examining physician is better able generally to diagnose a patient than a nonexamining physician simply is irrelevant to an evaluation of PFT results. The tracings are intended to be evaluated by non-examining physicians. Moreover, none of the examining physicians was present during Sieberg's testing, and thus cannot reasonably be credited with a more astute appreciation of the validity of Sieberg's PFTs than a nonexamining physician who must judge the test results by the very same tracings.

■ Thus, Judge Feldman's decision cannot be affirmed on his explicitly articulated rationale. Sieberg, however, would have us assume that Judge Feldman's decision embodies by implication "a weighing process, balancing the indicia of reliability and validity demonstrated by the ventilatory studies' [PFTs] compliance with the quality standards against the assertions of unreliability and invalidity made by petitioner's consultants." We decline to make such an assumption. Had Judge Feldman appreciated the irrelevance of his stated basis for rejecting the consultants' reports, he might well have reached a different conclusion. If, as Sieberg suggests, the ALJ rejected the consultants' reports as conclusory and unsupported by medical authority, he should have said so explicitly. We claim little expertise in judging the validity of pulmonary function studies. The ALJ must first evaluate and weigh the medical evidence that bears upon validity. *See John W. McGrath Corp. v. Hughes*, 289 F.2d 403, 405 (2d Cir.1961). We will not do so in his stead. *See Arnold v. Secretary of HEW*, 567 F.2d 258, 259 (4th Cir.1977) ("Unless the [ALJ] has sufficiently explained the weight he has given to obviously probative exhibits to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' ") (citations omitted).

Moreover, despite the urgings of Sieberg, we cannot, as a matter of law, dismiss the consultants' reports as too conclu-

sory. Unlike those rejected in *Shrader v. Califano*, 608 F.2d 114 (4th Cir.1979) and *Johnson v. Califano*, 585 F.2d 89 (4th Cir. 1978), the reports here are replete with detail. In *Shrader*, the court rejected the ALJ's reliance on a consultant's conclusion that the $FEV_1$ value of a PFT was "taken at too slow a speed" where there was no indication as to how the consultant arrived at such a determination. *Id.* at 118. The court also rejected a second consultant's opinion because "the doctor's recalculation of the $FEV_1$ showed a value still qualifying under the interim tables!" *Id.* In *Johnson*, a consulting physician discounted the results of a PFT because there was no "reproducibility of the study" shown by the accompanying tracings. *Id.* at 91. Again the court refused to accept on blind faith the unexplained conclusions of an expert. *Id.*

By contrast, in this case Dr. Anderson indicated that Study I was invalid because

> [the] technician did not calculate the $FEV_1$ from the expirogram with the most rapid flow rate. When this is done, the $FEV_1$ comes out to be 2.75 liters rather than 2.1 liters which was calculated by the technician from a slower expirogram. This then yields an $FEV_1$ that is 89% of the predicted which is well within the normal range as opposed to the 67% indicated on the report sheet.

Employer's Exhibit H. Dr. Anderson also stated that "[t]he highest MVV of 90 L./min. which is 63% of the predicted is clearly in error since it is physiologically impossible to have an $FEV_1$ that is 89% of the predicted and an MVV of only 63%." *Id.*

With regard to Study III, Dr. Anderson indicated that the tracings did not permit independent calculations because "neither the time lines nor volume lines can be seen." *Id.* Dr. Morgan concurred in this assessment, concluding that the "tracings are uninterpretable as there is no calibration on the paper." Employer's Exhibit I. Although Sieberg contends that an examination of the tracings shows they were merely fed into the testing apparatus upside down and therefore still permit inde-

pendent analysis, such a determination is clearly a question of fact for the ALJ to consider.

We do not mean to suggest that the consulting physician's opinions are correct or that Sieberg's PFTs are necessarily invalid. The ALJ, however, must address the valid contentions raised by Ziegler's consulting physicians and indicate explicitly the rationale that underlies his determinations.

This case is

REVERSED AND REMANDED.