**SAGINAW MINING COMPANY, Petitioner,**

v.

**George L. FERDA, et al., Respondents.**

**No. 88–3636.**

United States Court of Appeals, Sixth Circuit.

Argued May 26, 1989.

Decided July 7, 1989.

John G. Paleudis (argued), Hanlon, Duff & Paleudis, St. Clairsville, Ohio, for Saginaw Mining Co.

Jennifer L. Sargus (argued), Volk, Frankovitch, Anetakis, Recht, Robertson & Hellerstedt, Wheeling, W.Va., for George L. Ferda.

Patricia Nece, Michael J. Denney, Donald S. Shire, Assoc., Sol., U.S. Dept. of Labor, Office of the Sol., Washington, D.C., for Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor.

Before MILBURN, Circuit Judge; CELEBREZZE, Senior Circuit Judge; and BERTELSMAN, District Judge *.

* Honorable William O. Bertelsman, United States District Judge for the Eastern District of Ken-

MILBURN, Circuit Judge.

Petitioner Saginaw Mining Company ("Saginaw") seeks review of the final order of the Benefits Review Board ("BRB") affirming an award of benefits for claimant-respondent George Ferda under the Black Lung Benefits Act ("Act"), 30 U.S.C. §§ 901 *et seq.* For the reasons that follow, the petition is denied, and the award of benefits is affirmed.

I.

Claimant Ferda filed for benefits on June 21, 1979. At the time of filing, Ferda was still employed by Saginaw, although he had changed jobs and moved away from the surface of the mine in the hope of alleviating breathing difficulties. Ferda indicated in his application that he desired to continue working as long as his health would permit.

On September 4, 1979, Saginaw was provided with a "Notice of Initial Finding" stating that the Department of Labor found Ferda eligible for benefits based upon medical evidence demonstrating total disability due to a respiratory condition arising in the course of coal mine employment. Saginaw subsequently filed a timely controversion, sending the litigation into motion and rendering the finding of eligibility subject to redetermination.

A conference was held on March 20, 1980. A memorandum of the conference indicates that although Ferda was still working, he intended to quit work in 1980. The memorandum also notes that X-rays of both the Department of Labor and Saginaw's medical consultant revealed simple pneumoconiosis. A finding in Ferda's favor was entered, with payments to begin at the time he stopped work.

Ferda terminated his employment with Saginaw on August 1, 1980, at which time he alleged that he was unable to perform the types of jobs Saginaw informed him were available. Pursuant to the earlier conference finding, temporary interim ben-

tucky, sitting by designation.

efits were instituted. Ferda retired thirty-five hours short of receiving a complete pension.

At the hearing before an Administrative Law Judge ("ALJ") held on September 29, 1983, Saginaw relied upon the deposition of its medical consultant, Dr. George Kress. However, because Ferda's counsel had been unable to attend Dr. Kress' deposition which was scheduled by Saginaw, the ALJ permitted Ferda's counsel thirty days within which to respond to Dr. Kress' testimony.

At the administrative hearing, Ferda denied making certain statements regarding his ability to work that were attributed to him by Saginaw at the earlier conference. Although Saginaw made no request at the hearing, it subsequently requested that it be permitted to submit post-hearing evidence regarding Ferda's statements at the conference.

When Ferda attempted to submit interrogatories to Dr. Kress concerning the subject matter upon which his counsel wished to cross-examine him, Saginaw objected and submitted an affidavit of an individual attending the conference which allegedly contradicted Ferda's testimony at the hearing. On November 16, 1983, the ALJ issued an order requiring Dr. Kress to answer the interrogatories and otherwise submit to cross-examination at Saginaw's expense because Saginaw scheduled Dr. Kress' deposition at a time during which, through no fault of her own, Ferda's counsel could not be present. Further, the ALJ declined to allow Saginaw to submit the affidavit in question because it was inadmissible hearsay. Additionally, the ALJ extended the time during which Ferda could submit post-hearing evidence.

On March 19, 1984, the ALJ issued a decision and order awarding benefits. On May 31, 1988, the BRB issued a decision and order affirming the ALJ's award of benefits. This timely petition for review followed.

Ferda was born on March 5, 1919, and completed the tenth grade in school. His wife and son are his only dependents. He was employed in the nation's underground coal mines from 1938 until July 31, 1980. Ferda's employment with Saginaw began in 1973. His job duties included recovering timbers, running the continuous miner, hauling supplies, and for a brief period of time, operating a coal blender. He also performed the job of supply man for a year to a year and one-half.

A supply man brings into the mine cement slabs, thirty gallon oil drums, cinder blocks, posts, machine parts, and rock dust. These supplies are loaded on the car by high-lift but have to be rearranged on the car manually. The oil drums weigh in excess of fifty pounds, and the posts weigh fifty to sixty pounds. The supplies are unloaded manually. After working as a supply man, Ferda blended coal for approximately six months before retiring. That job required him to occasionally do maintenance work in the tipple. When he was informed that his current position was being abolished and that he would have to return to shoveling coal, a task which takes place solely underground, Ferda informed his employer that his breathing difficulties would not permit him to perform that position and voluntarily terminated his employment.

At the administrative hearing, Ferda's son testified that his father breathes hard if he does any walking or exerts himself. He also testified that Ferda's breathing has become noticeably worse since his retirement in 1980.

One of Ferda's coworkers, Mike Funari, stated in an affidavit submitted at the hearing that he had worked as a supply man with Ferda, and that the job required a great deal of lifting. He stated that Ferda's breathing was labored when he performed his task as a supply man, that on many occasions he would have to tell Ferda to stop, and that he would perform Ferda's work while he stopped to catch his breath. Ferda indicated at his hearing that his breathing was restricted, that his energy was low, and that his overall health was not very good. He sleeps in the downstairs of his home, his family performs tasks such as mowing the lawn, and he takes daily

medication, Slo–Phyllin, to help his breathing.

The medical evidence of record begins with an examination on August 7, 1979. A chest X-ray was read as positive by an "A" reader and reread as positive by a "B" reader.[1] Dr. J. Kuziak performed ventilatory and blood gas studies. Ferda was found to be sixty-nine inches tall, his FEV was 2.22, and his MVV was 93.6, which values qualify under 20 C.F.R. § 727.203(a)(2). A pulmonary specialist retained by the United States Department of Labor reviewed the ventilatory study and certified its validity. Dr. Kuziak also performed blood gas studies while Ferda was resting and during exercise. Both tests produced results which were nonqualifying under section 727.203(a)(3).

Ferda was then examined by his treating physician, Dr. M. Michelena, who reviewed the studies, completed the Department of Labor's questionnaire concerning work ability, and performed a physical examination of Ferda. Dr. Michelena noted no difficulty in walking, that Ferda could climb ten stairs without difficulty, shortness of breath after lifting more than fifty pounds, which Ferda could not carry more than 100 feet, and diagnosed Ferda as suffering from a moderate degree of chronic obstructive lung disease due to coal mine employment.

Saginaw had Ferda examined by its consulting physician, Dr. Kress,[2] on September 4, 1979. X-rays taken that day were read by Dr. Kress, a "B" reader, as positive for simple pneumoconiosis. The X-ray was subsequently reread by another "B" reader and found negative for pneumoconiosis.

Dr. Kress performed a ventilatory study on Ferda which produced nonconforming values. Blood gas studies were also taken. While resting, the test resulted in a $pCO_2$ of 33 and $pO_2$ of 64, which is a qualifying result under section 727.203(a)(3). After exercise, blood was drawn and a $pCO_2$ of 29 and a $pO_2$ of 88 were reported, which are nonqualifying values.[3] As a result of the studies and the physical examination, Dr. Kress opined that Ferda had very simple early coal workers' pneumoconiosis that was a result of his coal mining experience, but that he did not have any disability.

Several years later, Dr. Kress was made aware of the nonqualifying blood gas studies that were taken by Dr. Kuziak one month prior to Dr. Kress' initial examination. Dr. Kress then concluded that the qualifying resting blood gas study he performed could not possibly be accurate in light of the earlier nonqualifying blood gas studies and the blood gas study taken after exercise which provided nonqualifying values.

On March 16, 1981, Dr. Kress examined another X-ray of Ferda and again found it positive for simple pneumoconiosis. On January 18, 1982, another chest X-ray was taken. It was initially read by an "A" reader as negative, but Dr. Kress and an additional "B" reader reread the X-ray as positive.

Ferda was given a physical examination

1. A "B" reader has completed a more extensive Department of Health and Human Services' examination than an "A" reader, and has a proven proficiency in diagnosing pneumoconiosis. *Wolf Creek Collieries v. Robinson,* 872 F.2d 1264 n. 1 (6th Cir.1989).

2. In response to interrogatories submitted by Ferda, Dr. Kress indicated that he has specialized in pulmonary disease since 1944. However, he is not board certified in any area, and he is not recognized by the Directory of Medical Specialists as a specialist in any area. He examined 1,366 claimants for coal companies between January 1981 and November 1983. *Of that number, he is unable to provide the name of any claimant he diagnosed as totally disabled due to coal workers' pneumoconiosis.*

3. We note that the nonqualifying blood gas study taken by Dr. Kress after exercise does not conform with the Secretary's regulations. 20 C.F.R. § 718.105(b) provides that if the results of blood gas tests at rest produce nonqualifying values, an exercise blood gas test shall be taken and the "blood shall be drawn during exercise." In this case, the exercise blood gas study is clearly nonconforming because it was taken *after* exercise, not *during* exercise. Moreover, since the blood gas study taken while Ferda was resting produced qualifying results, the taking of the exercise blood gas study was itself in contravention of the Secretary's regulations.

by Dr. J. Tipton[4] on the same date, and ventilatory studies were performed. The ventilatory study produced an FEV of 1.94 and an MVV of 65, which are qualifying results. As a result of his physical examination and ventilatory studies, Dr. Tipton opined that Ferda was totally disabled as a result of his prolonged coal mine exposure.

Dr. Kress subsequently reviewed Dr. Tipton's ventilatory studies and opined that they were invalid because there were indications that Ferda was attempting to manipulate the result. Dr. Kress further opined that the test was improperly administered. On March 23, 1982, Dr. Tipton reviewed the evidence and again reiterated his conclusion that Ferda suffered a totally disabling pulmonary impairment from his employment in the nation's coal mines. Dr. Tipton reviewed the entire medical record and indicated that his earlier conclusion had not been altered, that Ferda suffered a demonstrable pulmonary impairment which met the criteria for disability for his age and height, and that the pulmonary disease arose as a result of his coal mine employment.

After reviewing the medical record and considering the testimony at the administrative hearing, the ALJ concluded that Ferda was entitled to benefits. With regard to the chest X-rays, the ALJ noted that the majority of X-ray interpretations and a majority of the interpretations by "B" readers were positive. Moreover, he noted that the most recent X-ray had been read as positive by two "B" readers,[5] and, therefore, he held that the interim presumption of 20 C.F.R. § 727.203(a)(1) was invoked.[6] *Saginaw concedes that the ALJ was correct in concluding that the interim presumption was invoked under (a)(1).*

The ALJ also reviewed the pulmonary function studies, noted that two of the three studies provided qualifying values, and concluded that the interim presumption was also invoked under 20 C.F.R. § 727.203(a)(2). With regard to the blood gas studies, the ALJ, without resolving the alleged deficiencies in testing, noted that three of the four results were nonqualifying and therefore concluded that there was no invocation under 20 C.F.R. § 727.203(a)(3). Finally, the ALJ concluded that the examinations of Dr. Michelena and Dr. Tipton were sufficient to invoke the presumption of 20 C.F.R. § 727.203(a)(4).[7]

With regard to rebuttal pursuant to 20 C.F.R. § 727.203(b), the ALJ concluded that Saginaw had failed to establish under section 727.203(b)(2) that Ferda was capable of performing his usual coal mine work. Noting the conflicting opinions of Dr. Kress and Dr. Tipton, the ALJ concluded that Dr. Tipton's opinion was entitled to greater weight because he had evaluated Ferda two years after Dr. Kress. Finally, the ALJ concluded that Saginaw had failed to rebut under section 727.203(b)(3) because all doctors agreed that Ferda's lung disease arose out of his coal mine employment.

On appeal, the BRB affirmed the ALJ's award of benefits. Although noting that the ALJ did commit a few errors in his analysis, the BRB nonetheless found the errors to be harmless and insufficient to vacate the ALJ's decision.

## II.

The black lung benefits program has been developed through several statutory

---

**4.** Dr. Tipton is board-certified in internal medicine, and the treatment and diagnosis of pulmonary diseases constitutes 90 percent of his practice.

**5.** The diagnosis of a "B" reader may be given greater weight by an ALJ. *See Lawson v. Secretary of Health & Human Servs.,* 688 F.2d 436 (6th Cir.1982).

**6.** 20 C.F.R. § 727.203(a)(1) provides that a claimant is entitled to a presumption of total disability if he has at least ten years of coal

mine employment and "[a] chest roentgenogram (X-ray), biopsy, or autopsy establish[ing] the existence of pneumoconiosis...."

**7.** Section 727.203(a)(4) provides that a claimant with a ten-year history of coal mine employment is entitled to a presumption of eligibility if medical evidence other than X-rays, biopsy, or pulmonary function studies "establishes the presence of a totally disabling respiratory or pulmonary impairment."

enactments, and as a result "different rules govern claims filed during different periods of time." *Mullins Coal Co. v. Director, Office of Workers' Compensation Programs*, 484 U.S. 135, 108 S.Ct. 427, 429, 98 L.Ed.2d 450 (1987). Title IV of the Federal Coal Mine Health and Safety Act of 1969 created two separate and distinct programs for awarding black lung benefits. The first, which was designated as Part B, applied to claims "filed prior to July 1, 1973, [which] were processed by the Social Security Administration (SSA) pursuant to regulations promulgated by the Secretary of the Department of Health, Education, and Welfare (HEW); when allowed, these 'Part B' claims were paid from federal funds." *Id.* (footnote omitted). The second program, designated as Part C, applied to claims filed on or after July 1, 1973. "[T]hey are paid by private employers or by a fund to which the employers contribute, and they are administered by the Director of Office of Workers' Compensation Programs (the Director) pursuant to regulations promulgated by the Secretary of Labor (the Secretary)." *Id.*

Originally, all Part B claims were evaluated under "permanent HEW regulations generally prescrib[ing] methods and standards for establishing elements of statutory entitlement." *Pittston Coal Group v. Sebben*, — U.S. —, 109 S.Ct. 414, 417, 102 L.Ed.2d 408 (1988). *See* 20 C.F.R. §§ 410.401–.476. However, in response to a dissatisfaction with the HEW's administration of Part B, Congress enacted the Black Lung Benefits Act of 1972, which liberalized the eligibility requirements for benefit awards. HEW responded by adopting a set of "interim" regulations set out at 20 C.F.R. § 410.490. The interim regulations established two classes of presumptions.

[A] claimant could establish presumptive entitlement by showing that "[a] chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis" and that "[t]he impairment ... arose out of coal mine employment." §§ 410.490(b)(1)(i), (b)(2).... The second presumption (drafted in a most confusing manner) enables a claimant to obtain presumptive entitlement by establishing specified scores on ventilatory tests if the miner had "at least ten years of the requisite coal mine employment." §§ 410.490(b)(1)(ii), (b)(3). Both presumptions were rebuttable by a showing that the miner was working or could work at his former coal mine employment or the equivalent. § 410.490(c). Miners unable to obtain either presumption had to proceed under the permanent HEW regulations. § 410.490(e).

*Pittston*, 109 S.Ct. at 417–18. Since the interim HEW regulations expired with the "B" program, after June 30, 1973, "the Secretary of Labor adjudicated Part C claims exclusively under the permanent HEW regulations." *Id.* at 418.

In response to a perceived low approval rate of claims, Congress enacted the Black Lung Benefits Reform Act of 1977 ("BLBRA"). The BLBRA transferred the authority to promulgate regulations for Part C claims from the Secretary of HEW to the Secretary of Labor. 30 U.S.C. § 902(f)(1). "Pending issuance of the new Labor Department regulations [permanent labor regulations], the BLBRA provided for an interim administrative regime applying standards different from (and more generous than) those of the permanent HEW regulations." *Pittston*, 107 S.Ct. at 418. The Act also required that the interim criteria "shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973." 30 U.S.C. § 902(f)(2).

In response, the Secretary of Labor promulgated in 1978 a set of regulations governing the review of pending and previously denied claims. These interim labor regulations provide a presumption of eligibility

if the claimant was engaged in coal mine employment for at least ten years and if the claimant meets one of four medical requirements: (1) a chest X-ray establishes the presence of pneumoconiosis; (2) ventilatory studies establish the presence of a respiratory or pulmonary disease—not necessarily pneumoconiosis—of a specified severity; (3) blood gas studies demonstrate the presence of an impair-

ment in the transfer of oxygen from the lungs to the blood; or (4) other medical evidence, including the documented opinion of a physician exercising reasonable medical judgment, establishes the presence of a totally disabling respiratory impairment.

*Mullins,* 108 S.Ct. at 431 (footnotes omitted). The regulation then explains rebuttal of the presumption:

> It first provides that in the adjudication of a claim, "all relevant medical evidence shall be considered." It then provides that the presumption is rebutted if the evidence establishes that the claimant is doing or is capable of doing his usual or comparable work, that his disability did not arise, even in part, out of coal mine employment, or that he does not have pneumoconiosis.

*Id.* at 432.

In 1980, the Secretary of Labor issued permanent regulations applicable to the adjudication of all Part C claims filed after March 31, 1980. *See* 20 C.F.R. § 718.1–.404. However, a question arose regarding the proper regulations to be applied to claims filed prior to the taking effect of the permanent labor regulations in Part 718 on April 1, 1980, but adjudicated after that date. In *Tennessee Consol. Coal Co. v. Crisp,* 866 F.2d 179 (6th Cir.1989), this court held that the permanent labor regulations were to be given only prospective application, and that the interim labor regulations applied to claims filed before the effective date of the permanent regulations of Part 718 but considered by an ALJ thereafter.

However, in a holding occurring almost two months later, this court held, without referring to our holding in *Crisp,* that "[i]n light of the broad remedial purposes of the Black Lung Benefits Act, we hold that a claim for benefits filed before March 31, 1980, but adjudicated by an ALJ after that date, should be considered under the new Part 718 permanent regulations." *Knuckles v. Director, Office of Workers' Compensation Programs,* 869 F.2d 996, 999 (6th Cir.1989) (footnote omitted). Another panel of this court has recently noted this

"apparent conflict." *Falcon Coal Co. v. Clemons,* 873 F.2d 916 n. 10 (6th Cir. April 26, 1989). In our view, however, the holdings in *Crisp* and *Knuckles* are not in conflict.

In *Knuckles,* the issue before the court was the proper interpretation and application of 20 C.F.R. § 727.203(d), which provides that if a claimant fails to establish eligibility for benefits under the interim labor regulation of section 727.203(a), he may attempt to establish eligibility under the permanent regulations of Part 718. Since Part 718 originally merely incorporated the permanent HEW regulations of Part 410 until the new permanent labor regulations were enacted, the issue before this court in *Knuckles* was whether the permanent HEW regulations or the permanent labor regulations applied under section 727.203(d) to claims filed before March 31, 1980, but adjudicated thereafter. Thus, we were not choosing between the interim labor regulations and the permanent labor regulations, as the court was required to do in *Crisp,* but were instead determining whether section 727.203(d) required the application of the permanent HEW or the permanent labor regulations. In *Knuckles,* we concluded that the permanent labor regulations would be given retroactive application in that situation. Indeed, the fact that the court was not suggesting that the interim labor regulations did not apply is evident from our holding wherein we first considered whether the ALJ properly failed to invoke the presumption of total disability under section 727.203(a).

■ Thus, this court does not have conflicting holdings as was suggested in *Falcon Coal.* In cases, like this one, where the claimant files an application for benefits prior to the enactment of the permanent labor regulation, but his claim is adjudicated thereafter, the interim labor presumptions of Part 727 apply. If the claimant is unable to invoke the interim presumption, then consideration must be given to whether he establishes disability under the permanent labor regulations of Part 718. In this case, since the parties concede that the interim presumption of 20 C.F.R.

§ 727.203(a)(1) was properly invoked by the ALJ, the only question before this court concerns rebuttal under 20 C.F.R. § 727.203(b).

### III.

■ This court "has a limited scope of review over the decisions of the Benefits Review Board" and the ALJ. *Welch v. Benefits Review Bd.*, 808 F.2d 443, 445 (6th Cir.1986) (per curiam). Our standard of review is to determine whether the ALJ's determination is supported by substantial evidence, and the findings of the ALJ as to any facts shall be conclusive if supported by substantial evidence. *See Neace v. Director, Office of Workers' Compensation Programs*, 867 F.2d 264, 267 (6th Cir.1989); *Engle v. Director, Office of Workers' Compensation Programs*, 792 F.2d 63 (6th Cir.1986); *see also Zimmerman v. Director, Office of Workers' Compensation Programs*, 871 F.2d 564, 567 (6th Cir.1989) ("Congress has expressly placed the power to make conclusive findings of fact with the ALJ, and limited the Board's function to determining whether the ALJ's findings are supported by substantial evidence. Under this scheme we are to defer to the ALJ, not to the Board.").

"Our function is only to see that the decision of the ALJ and Board was supported by substantial evidence, and that all evidence that the statute mandates be considered has been considered." *Engle*, 792 F.2d at 64; *see The Youghiogheny & Ohio Coal Co. v. Milliken*, 866 F.2d 195, 198 (6th Cir.1989). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Crisp*, 866 F.2d at 184 (6th Cir.1989).

### A.

■ Saginaw contends that the ALJ erroneously held that Dr. Tipton's opinion was entitled to greater weight than Dr. Kress' because he evaluated Ferda's pulmonary status more than two years after Dr. Kress. Saginaw contends that this is error because both Dr. Kress and Dr. Tipton reviewed the identical and most recent 1982 evidence of record.

In *Orange v. Island Creek Coal Co.*, 786 F.2d 724 (6th Cir.1986), the ALJ had before him five positive X-ray readings and four negative readings and ultimately gave the greatest weight to the most recent X-rays and ventilatory studies. This court upheld and sanctioned that reasoning, noting that the rationale in affording the greatest weight to the latest evidence is based upon the accepted medical belief that pneumoconiosis is a progressive disease. *Id.* at 727. *See Couch v. Secretary of Health & Human Servs.*, 774 F.2d 163, 168 (6th Cir. 1985).

As Saginaw concedes, the most recent evidence rule applies to the date of the underlying documentation rather than the date of the doctor's review of that evidence. In this case, Saginaw contends that both Dr. Kress and Dr. Tipton reviewed the most recent medical evidence of record, and the evidence before them was identical. That is true of the latest opinions rendered by both doctors, which were rendered solely upon a review of the record. However, Saginaw ignores the fact that Dr. Tipton based his initial opinion on his physical examination of Ferda. As a result of this physical examination, he concluded that Ferda was totally disabled. This physical examination occurred nearly two years after Dr. Kress' physical examination. Accordingly, Dr. Tipton's opinion is entitled to greater weight because it is the result of a more recent examination. The fact that neither doctor changed his mind after reviewing the entire medical record is of no relevance because both simply stood by the conclusions they had previously reached after a physical examination of Ferda. Accordingly, the ALJ did not err in considering Dr. Tipton's opinion to be more recent and therefore presumptively entitled to greater weight than Dr. Kress' opinion.

### B.

Saginaw further contends that the ALJ erred in failing to resolve the questions it

raised regarding the validity of certain pulmonary function studies. As Saginaw correctly notes, other circuits have held that invocation of the interim presumption requires a finding as to whether the studies are both conforming and qualifying. *See Twin Pines Coal Co. v. United States Dep't of Labor*, 854 F.2d 1212, 1217 (10th Cir.1988); *Zeigler Coal Co. v. Sieberg*, 839 F.2d 1280, 1282–83 (7th Cir.1988).

However, both *Twin Pines* and *Zeigler* are concerned with the initial invocation of the interim presumption, not whether the interim presumption has been rebutted, as is at issue here. In our view, that is a significant distinction. In order to invoke the interim presumption, as explained above, a claimant is required to meet one of four medical requirements. The Department of Labor's regulations provide specific criteria regarding the test and examinations, and only tests conducted in compliance with the regulations are sufficient to invoke the presumption. *See* 20 C.F.R. §§ 727.206, 718.102–.107. Accordingly, an ALJ must determine that the tests and examinations in question comply with the regulations, and, therefore, an ALJ is required to resolve allegations regarding the validity of studies or tests used to invoke the interim presumption.

■ On the other hand, when considering rebuttal, an ALJ is not required to resolve all allegations regarding the validity of pulmonary function studies. Section 727.203(b) explicitly states that all relevant evidence is to be considered. *See Mullins*, 108 S.Ct. at 432. Accordingly, an ALJ must consider not only medical evidence as would qualify to invoke the interim presumption, but all other medical evidence, including examinations and tests that were not conducted in compliance with the regu-

lations and therefore would not be sufficient to invoke the interim presumption. Since the ALJ is required to review all the relevant medical evidence and to weigh that evidence and to determine whether or not, by a preponderance, the interim presumption has been rebutted, he is not required to make a detailed finding of fact regarding every test alleged to be nonconforming. Any such requirement would be a needless hurdle in the resolution of black lung claims. Instead, the ALJ is simply required to explain how he arrived at his conclusion. Accordingly, since both parties concede that the interim presumption was properly invoked on the basis of X-rays, the ALJ did not err in failing to make factual findings regarding the validity of every pulmonary function study considered in rebuttal.

## C.

■ Saginaw's final contention is that substantial evidence does not support the ALJ's conclusion that it had failed to rebut the interim presumption.[8] Since Saginaw concedes that the interim presumption was properly invoked on the basis of positive X-ray readings under 20 C.F.R. § 727.203(a)(1), and that Ferda was no longer employed at the time of the hearing, rebuttal was available only under 20 C.F.R. §§ 727.203(b)(2) and (b)(3). *See Mullins*, 108 S.Ct. at 435. Saginaw alleges that the ALJ erred in concluding that there was no rebuttal under section 727.203(b)(2) because the ALJ failed to consider Dr. Kress' opinion that Ferda had no total disability, and, therefore, inferentially, he was able to perform his usual coal mine work. We disagree.

8. 20 C.F.R. § 727.203(b) provides:

(b) *Rebuttal of interim presumption.* In adjudicating a claim under this subpart, all relevant medical evidence shall be considered. The presumption in paragraph (a) of this section shall be rebutted if:

(1) The evidence establishes that the individual is, in fact, doing his usual coal mine work or comparable and gainful work (see § 410.412(a)(1) of this title); or

(2) In light of all relevant evidence it is established that the individual is able to do his usual coal mine work or comparable and gainful work (see § 410.412(a)(1) of this title); or

(3) The evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment; or

(4) The evidence establishes that the miner does not, or did not, have pneumoconiosis.

In *Cooley v. Island Creek Coal Co.*, 845 F.2d 622, 624 (6th Cir.1988), this court held that

> [w]hen the presumption under § 727.203(a)(1) is triggered, it is presumed that the claimant is disabled by reason of pneumoconiosis, not simply that the claimant has pneumoconiosis. In order to rebut this presumption under § 727.203(b)(2) the Director [or in this case the employer] must produce evidence showing that the claimant is able to do his usual coal mine work or comparable and gainful work, and not merely that "the claimant is not totally disabled due to respiratory or pulmonary impairment."

(quoting *York v. Benefits Review Bd.*, 819 F.2d 134, 138 (6th Cir.1987)). In the present case, such simply has not been done.

The only attempt made by Saginaw to establish Ferda's employability is inferentially through Dr. Kress' opinion that he was not disabled. There is no direct evidence to suggest that Ferda is capable of performing gainful work as required by this court's holding in *Cooley*. Moreover, there is significant other evidence in the record to contradict Dr. Kress' findings. As noted above, Dr. Tipton examined Ferda subsequent to Dr. Kress and reached a contrary conclusion when he opined that Ferda was totally disabled. Saginaw contends that Tipton's conclusion should not be counted because he relied on studies that were invalid, but as was noted above, Dr. Kress' conclusion is also based on invalid tests and studies.

Moreover, the ALJ specifically rejected Kress' conclusions that Tipton's studies were of no value and explicitly gave them at least some value in his determination. Finally, the very first ventilatory study taken produced qualifying results, and that study has been certified as validly taken. Therefore, when all relevant evidence is considered, including the nonmedical testimony at the hearing, it is clear that there is substantial evidence from which the ALJ could conclude that Ferda was not employable as a result of pneumoconiosis.

Saginaw also argues that rebuttal was accomplished under section 727.203(b)(3) because, inferentially, Dr. Kress' conclusion that Ferda was not totally disabled logically means that he was not disabled from coal mine employment. The inquiry under subsection (b)(3) is on causation. The miner does not have to establish that coal mine employment was solely the cause of his pulmonary impairment; he must simply establish that it was *a* cause of his disability. As this court held in *Gibas v. Saginaw Mining Co.*, 748 F.2d 1112 (6th Cir.1984), *cert. denied*, 471 U.S. 1116, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985),

> section 727.203(b)(3) has nothing to do with the degree of a miner's disability. On the contrary, it concerns the burden placed upon an employer in order to rebut the interim presumption of section 727.203(a).... If an employer is able to prove that pnemoconiosis played no part in causing a miner's disability, then the employer has satisfied the requirements of section 727.203(b)(3). Where, however, pneumoconiosis is a contributing cause to a miner's total disability, he is conclusively entitled to benefits.

*Id.* at 1120; *see Crisp*, 866 F.2d at 184; *Wright v. Island Creek Coal Co.*, 824 F.2d 505, 508 (6th Cir.1987). In this case, there is absolutely no evidence suggesting that Ferda's disability arose from anything other than his coal mine employment. While the record does reflect that he smoked one pack of cigarettes a day from 1955 to 1965, Dr. Tipton explicitly rejected his smoking as being a significant cause of his pulmonary impairment, and Saginaw does not question that conclusion. Dr. Kress' conclusion that Ferda suffers from no impairment is simply insufficient for rebuttal under section 727.203(b)(3).

Moreover, for the same reasons the ALJ properly denied rebuttal under section 727.-203(b)(2), rebuttal was also properly denied under section 727.203(b)(3). When the totality of the evidence is considered, there is more than substantial evidence from which the ALJ could have rejected Dr. Kress' conclusions, and the ALJ specifically did so. As noted above, it was not error for the

ALJ to give greater weight to the most recent examining physician's opinion, and in light of the other evidence, some of which was provided by Dr. Kress, including the existence of a totally disabling pulmonary condition, we cannot say the ALJ's conclusions are erroneous.

In sum, an examination of the record reveals that every physician examining the claimant, with the exception of Dr. Kress, the employer's consulting physician, concluded that Ferda was totally disabled. To rule in favor of Saginaw, we would have to reach the conclusion that every test and examination conducted by a doctor other than the employer's consulting physician is invalid and of virtually no weight. In our view, such a conclusion cannot be reached from an examination of the record.

### IV.

Accordingly, the petition for review is DENIED, and the Board's order awarding benefits is AFFIRMED.