PEABODY COAL CO. & OLD
REPUBLIC INSURANCE CO.,
Petitioner–Appellant,

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, U.S.
DEPARTMENT OF LABOR, & WOOD-
ROW BRINKLEY, Respondent–Appel-
lee.

No. 90–3776.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1991.

Decided Aug. 28, 1992.

Order on Denial of Rehearing
Oct. 21, 1992.

Mark E. Solomons (argued), Arter &
Hadden, Washington, D.C., for petitioners.

Barbara J. Johnson, Donald S. Shire, Sol.
Gen., Lawrence W. Rogers, C. William
Mangum, Department of Labor, Office of
the Sol., Washington, D.C., and Harold B.
Culley, Jr. (argued), Raleigh, Ill., for re-
spondents.

Carla Chapman and Ann McLaughlin, Benefits Review Bd., Dept. of Labor, Washington, D.C., for party-in-interest.

Before COFFEY and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

An Administrative Law Judge awarded benefits to Woodrow Brinkley under Title IV of the Federal Coal Mine Health and Safety Act of 1969 (the Black Lung Benefits Act), 30 U.S.C. § 901 *et seq.* The Benefits Review Board affirmed, and Brinkley's employer, Peabody Coal, petitioned for review.

The ALJ invoked the interim presumption of 20 C.F.R. § 727.203(a)(2) on the basis of three pulmonary function tests which physicians opined were invalid. He considered the notations indicating that the technicians administering the tests considered Brinkley's cooperation in and comprehension of the tests "good" were of equal weight with the physicians opinions, and he relied on the "true doubt" rule in invoking the presumption.

Peabody Coal raises two issues 1) whether the technicians' statements of cooperation constitute sufficient evidence of validity to offset the physicians' invalidity opinions and 2) whether the "true doubt" rule violates Section 7(c) of the Administrative Procedure Act.

Mr. Brinkley seeks affirmance. The Director, Office of Workers' Compensation Programs, Department of Labor, supports the "true doubt" rule, but argues that the decision should be vacated because the three tests cannot properly invoke the presumption in this case.

## BACKGROUND

Woodrow Brinkley was a night watchman for eleven years at a surface mine operated by Peabody Coal.[1] Brinkley retired at age 62 because of high blood pressure and breathing problems. He subsequently filed a claim for benefits under the Black Lung Benefits Act. Peabody Coal contested the Department of Labor's award of benefits. Brinkley introduced varied medical evidence to support invocation of one of the presumptions of impairment under 20 C.F.R. § 727.203(a).

The majority of Brinkley's x-ray readings were negative for pneumoconiosis. Three arterial blood gas studies were introduced, but none showed a significant respiratory disease. Brinkley took four pulmonary function tests over a span of seven years.[2] All four tests produced values that qualified for the presumption of impairment. On the first appeal, the Board excluded the last of the four tests from consideration, because it did not include a statement of cooperation and, thus, was nonconforming. Brinkley does not challenge the exclusion of the fourth test on this appeal. The remaining three tests were both "qualifying" and "conforming." Several physicians reviewed and evaluated the tracings from the three remaining tests. They found all three of the tests to be invalid. Details concerning the results of the tests and the physicians' opinions are included in the discussion below. Peabody Coal introduced the physicians' opinions into evidence. Brinkley introduced no medical evidence to contradict the physicians' opinions.

The ALJ found the weight of evidence opposing and supporting validity to be equal and applied the "true doubt" rule to award benefits.[3] The Benefits Review

---

1. Brinkley performed other functions, aside from his watchman duties, that qualified as coal mining. The ALJ found that Brinkley should be classified as a coal miner for purposes of the presumption. Peabody Coal challenged the classification on the first appeal to the Board, and the Board affirmed. Peabody Coal does not challenge the classification on this petition to review.

2. The ALJ found that only the pulmonary function tests were sufficient to invoke the presumption. On this appeal, Brinkley does not challenge the ALJ's findings concerning the other presumptions. Brinkley relies exclusively on the pulmonary function tests and the Part 272.-203(a)(2) presumption.

3. The "true doubt" rule was created by the Benefits Review Board in *Provance v. United States*

Board found that the ALJ had considered the fact that the three qualifying and conforming tests had been reviewed and found invalid by several consulting physicians. The Board reasoned that, although the ALJ had the discretion to find that the consulting physicians' opinions invalidated the tests, those opinions do not automatically require a finding of invalidity. The Board held that the ALJ properly found the tests, because they were conforming, to be prima facie reliable and upheld the ALJ's finding that the validity evidence was equally divided.

## DISCUSSION

■ In reviewing an award of benefits under the Black Lung Benefits Act, we are limited to a determination of whether the ALJ's decision is supported by substantial evidence, rational and in accordance with law. *Dotson v. Peabody Coal Co.,* 846 F.2d 1134, 1137 (7th Cir.1988). The weighing of medical evidence is within the discretion of the ALJ. *Peabody Coal Co. v. Director, Office of Workers' Comp. Programs, United States Dept. of Labor,* 778 F.2d 358, 362 (7th Cir.1985). The ALJ, however, does not have complete discretion in crediting or discrediting medical evidence. *Id.* "[T]he ALJ must consider all relevant medical evidence, cannot substitute his expertise for that of a qualified physician, and, absent countervailing clinical evidence or a valid legal basis for doing so, cannot simply disregard the medical conclusions of a qualified physician." *Wetherill v. Director, Office of Workers' Comp. Programs, United States Dept. of Labor,* 812 F.2d 376, 382 (7th Cir.1987).

■ Peabody Coal argues that the requirements of 20 C.F.R. § 718 give meaning to the Part 410.430 requirements and, therefore, should be considered in determining whether a test is conforming. Pursuant to 30 U.S.C. § 902(f)(1), the Department of Labor promulgated the Part 718 regulations to establish criteria for all medical tests administered in connection with a claim for benefits. Brinkley filed his claim for benefits on March 6, 1978.

Part 718 is expressly made applicable only to claims filed after March 30, 1980, and therefore, would not apply to Brinkley's claim. 20 C.F.R. § 718.2. The quality standards for pulmonary function tests set out at 20 C.F.R. § 410.430 govern Brinkley's claim, and the consulting physicians' opinions, which showed that the tests did not meet the validity requirements of Part 718, although relevant to the medical validity of the tests, do not automatically require a finding of invalidity. We decline to interpret the Part 410.430 requirements with reference to the Part 718 regulations because the Part 718 regulations were made expressly inapplicable to such claims, filed before their effective date. However, since in Part 718 the Department of Labor intended to set out the recognized medical standards for evaluating medical tests and Part 410.430 implicitly requires medically valid tests, the analysis will be strikingly similar under Part 410.430. In this case, the ALJ was required to consider whether, in light of all the evidence, the medical opinions invalidated the test results.

■ Peabody Coal argues that the ALJ's decision was contrary to this court's decision in *Zeigler Coal Co. v. Sieberg,* 839 F.2d 1280 (7th Cir.1988). In *Sieberg,* we held that the validity of a pulmonary function test cannot be presumed from fulfillment of the Part 410.430 criteria, including the required tracings, when the tracings demonstrate that the test was invalid. Part 410.430 requires that three tracings accompany each pulmonary function test in order to permit independent evaluation of the test. A presumption of validity from the mere existence of the tracings and statement of cooperation would allow an invalid test to invoke the presumption. *Sieberg,* 839 F.2d at 1282–83. The ALJ, therefore, must consider the invalidity opinions of consulting physicians.

Peabody Coal asserts that the ALJ improperly disregarded the physicians' invalidity opinions and, essentially, presumed validity from fulfillment of the Part 410.-430 requirements. In both of his opinions,

*Steel Corp.,* 1 Black Lung Rep. 1–483 (Ben.Rev. Bd.1978).

the ALJ set out the evidence of invalidity from the consulting physicians' opinions. The ALJ stated that he found this evidence to be probative and the physicians' credentials to be impressive. The ALJ then went on to find the evidence equally divided and awarded benefits. Thus, he did consider the physicians opinions and did not merely presume validity from fulfillment of Part 410.430.

Peabody Coal argues further, however, that the ALJ's conclusion that the technicians' notations of good cooperation and the physicians' opinions to the contrary were of equal weight was irrational and not supported by substantial evidence. We agree. The ALJ must give justifiable reasons for rejection of medical evidence. *Dotson*, 846 F.2d at 1138. When no medical evidence is presented to contradict the evidence of invalidity, it is not rational to conclude that the tests are valid. *See Peabody Coal Co. v. Lowis*, 708 F.2d 266, 276 (7th Cir.1983) and *Wetherill*, 812 F.2d at 382. Straightforward, relevant analysis of a test's validity, such as that contained in these invalidity opinions, is not to be lightly dismissed. *Dotson*, 846 F.2d at 1138.

Part 410.430 requires that three tracings be prepared for each pulmonary function test and that a statement of the patient's cooperation with and understanding of the test be included in the technician's report. It is undisputed that the three pulmonary function tests relied upon by the ALJ in this case met the express requirements of Part 410.430, but 410.430 also implicitly requires valid tests, and these tests did not meet that requirement. The tests also produced MVV and $FEV_1$ values that qualified for invocation of the presumption under 20 C.F.R. § 272.-203(a)(2). Although the tests were qualifying and conforming, they must also be valid. An invalid pulmonary function test proves nothing and will not invoke the presumption. *Sieberg*, 839 F.2d at 1283.

The three tracings are required to accompany each test in order to allow for an independent evaluation of the test results. *Id.* at 1282. The defendant has the right to challenge the test results by presenting evidence of the test's invalidity. 5 U.S.C. § 556(d). The existence of the qualifying pulmonary function tests, by itself, is not conclusive of the existence of a disability. The interpretation of the tracings is what counts. *Dotson*, 846 F.2d at 1138; *See also, Mullins Coal Co. v. Director, Office of Workers' Comp. Programs, United States Dept. of Labor*, 484 U.S. 135, 147–48, 108 S.Ct. 427, 433–34, 98 L.Ed.2d 450 (1987).

The consulting physicians' invalidity opinions are based upon recognized medical standards.[4] Pulmonary function tests are used clinically in the diagnosis and treatment of a variety of pulmonary impairments. Errors in diagnosis and treatment can be created by reliance on the results of poorly performed pulmonary function tests. During pulmonary function testing, patients are often apprehensive, frightened, confused or hurting. As a result, their comprehension and effort is sometimes less than optimal. Equipment problems, such as air leaks around the mouthpiece, nose-clip, or tubing, may also add to the inaccuracy of test results. These problems with the testing procedure are readily apparent from an evaluation of the tracings. For a test to be considered reproducible and, thus, accurate as an indicator of true ventilatory function, the best two out of three $FEV_1$ tracings must have maximum values that agree within five percent. Albert Miller, ed., Pulmonary Function Tests in Clinical and Occupational Lung Disease 23–25, 34–35 (1986).

Brinkley's first pulmonary function test was performed on June 21, 1978. The identity of the technician administering the test is unknown. Someone, presumably the technician, circled the word "good" on the test form to indicate that Brinkley exhibited good comprehension and cooperation. The test resulted in a qualifying $FEV_1$ val-

4. These recognized medical standards are now expressed in Part 718 of the regulations, but even before Part 718 was promulgated, tests were required to be valid and recognized medical standards applied.

ue of 2.19 and a qualifying MVV value of 61.5. Three physicians reviewed and evaluated the tracings from the June 21, 1978, test. Dr. Paul found a "poor correlation between the $FEV_1$ and the maximum voluntary ventilation [MVV]" values and a variation between the $FEV_1$ tracings that was "greatly outside the 5% error rate, if one is doing maximal effort, suggesting that this was technically poorly performed test or there was submaximal effort on the part of the patient." Dr. Morgan found an unacceptable variation, greater than ten percent, between the MVV tracings which in his opinion "rendered the test invalid and indicates inconsistent or suboptimal cooperation on the part of the patient." All three physicians concluded that the tracings indicated a poorly performed test or suboptimal effort by the patient, thus making the test invalid for accurate interpretation.

The second pulmonary function test was performed on March 27, 1980. The identity of the technician administering the test, again, is unknown. Someone circled the word "good" to indicate good comprehension and cooperation. The test resulted in a qualifying $FEV_1$ value of 2.06 and a qualifying MVV value of 62.89. The tracings were reviewed and evaluated by the same three physicians. All physicians found excessive variation, greater than five percent, in the $FEV_1$ tracings. Dr. Paul found a "poor correlation between the $FEV_1$ and the maximum voluntary ventilation [MVV]" values. Dr. Morgan found that "the FEV's, forced vital capacities and MVV's did not come within the 5% standard and none of the MVV's were done for the required 12 second period." All physicians, again, concluded that the tracings indicated a poorly performed test or suboptimal effort by the patient, thus making the test invalid.

The third pulmonary function test was performed on December 14, 1984. The technician's identity was known, but no evidence of his qualifications was introduced at trial. The technician indicated that Brinkley's comprehension and cooperation were good. The test resulted in a qualifying $FEV_1$ value of 1.69 and a qualifying MVV value of 61.0. The tracings were reviewed and evaluated by six physicians. All six physicians found the variations in the $FEV_1$ tracings to be greater than the five percent standard for reproducibility and accuracy. Dr. Smith noted, "The studies were of poor quality in that there was lack of reproducibility of the forced expiratory maneuvers with more than a 10% variation in the efforts." Dr. Renn concluded, "[T]he pulmonary function test performed by Mr. Woodrow Brinkley on December 14, 1984 are invalid for accurate interpretation or for the derivation of significant data with which to assess his true ventilatory function." The other four physicians similarly concluded that the test was invalid for interpretation and could not be used to determine Brinkley's true ventilatory function.

In summary, the evidence showed that the tracings did not meet recognized medical standards for reproducibility and accuracy. Medical standards require a variation of five percent or less between the $FEV_1$ tracings. All of Brinkley's tests produced $FEV_1$ tracings with a variation exceeding five percent, and some of the tests produced tracings that varied by more than ten percent.

The ALJ recognized the "impressive" qualifications of the consulting physicians. The ALJ noted, however, that there was no evidence to show that the technicians were not "trained, skilled performers who readily recognize good cooperation and comprehension" and thus, he implicitly assumed that the observing technicians were equally qualified to assess the value of the tests. *Brinkley v. Peabody Coal Co.*, Case No. 81–BLA–9795, at 2 (Aug. 10, 1988). The qualifications of the technicians were not in the record. It was rational for the ALJ to assume that the technicians were qualified to do their jobs, but the ALJ should not assume that they were equally qualified to assess the validity of the tests without evidence in the record to support that assumption. The technician's ability to give instructions, to encourage the patient to give maximal effort, and to detect suboptimal effort is essential to accurate pulmonary function testing. Miller, *supra* at 36. Their notations of good cooperation do not amount to substantial evidence that they

succeeded in producing a valid test in the face of competent opinions that the results show the contrary.

No objective medical evidence was introduced to contradict the consulting physicians' opinions. Brinkley did not introduce contrary interpretations of the tracings showing the tests to be reliable and valid. Information of some clinical, but limited, value can be obtained even from invalid tracings. A physician can sometimes determine that an $FEV_1$ is characteristic of impairment although the values obtained are not reliable. Miller, *supra* at 37. In this case, however, Brinkley did not introduce that type of evidence. No physician testified that the tests, although invalid, were characteristic of impairment. The ALJ noted that there were "no readily apparent discrepancies in the values" and that "the results appear to have a certain amount of internal consistency and exhibit a downward trend." *Brinkley v. Peabody Coal Co.*, Case No. 81–BLA–9795, at 9 (Oct. 16, 1985). The ALJ assumed, without any evidence from a medical expert, that the consistency between the tests indicated an impairment. An invalid test does not become valid because it is consistent with two other invalid tests.

The presumptions created by the Department of Labor rely upon the inference that it is highly probable that a coal miner with a breathing impairment such that the prescribed tests yield qualifying values suffers from pneumoconiosis. That inference breaks down when qualifying test results are overcome by more reliable conflicting medical evidence, such as evidence that the tests were not properly performed. *See, Mullins*, 484 U.S. at 157–58, 108 S.Ct. at 439–40. In the circumstances of this case, the technicians' subjective statements of observed cooperation cannot offset the uncontradicted, objective medical opinions of six consulting physicians, found by the ALJ to be highly qualified. We hold that there was no rational basis for the ALJ's conclusion that the evidence was equally probative.

Because we hold that the evidence on validity was not equally probative, but instead clearly favored invalidity, we do not reach the question of the propriety of the "true doubt" rule.

The petition for review is GRANTED, and the decisions of the Benefits Review Board and the ALJ are VACATED.

Order.

Oct. 21, 1992.

Mr. Brinkley's petition for rehearing does not challenge the merits of our decision to vacate the award which the Coal Companies asked us to review. Instead, he asks us to "remand this case to the ALJ for consideration of whether the presumption can be invoked under 20 C.F.R. 727.-203(a)(4)."

We do not consider that a remand is necessary to permit the agency to give consideration to Mr. Brinkley's case on any appropriate ground not inconsistent with our opinion. Our decision vacating the existing award leaves him free to ask an award on his alternative theory.

The petition for rehearing is DENIED.